IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

DAVID WESLEY,

                            Plaintiff,            Civil Action No.
                                                  9:08-CV-0953 (NAM/DEP)

            v.

NANCY O'CONNOR-RYERSON,

                            Defendant.
------------------------------------------------------------

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

DAVID WESLEY, *Pro Se*
07-A-4840
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN          RICHARD LOMBARDO, ESQ.
Office of the Attorney General     Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

      Plaintiff David Wesley, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.  In his complaint, as amended, plaintiff asserts that the named defendant, identified as a nurse practitioner at the facility where plaintiff was confined at the relevant times, was deliberately indifferent to his serious medical needs by failing to treat symptoms complained of by Wesley during sick call and ordering that his prescription medication for Lupus be discontinued.  As relief, plaintiff requests an award of both compensatory and punitive damages totaling $200,000.

Currently pending before the court is a motion brought by the defendant for summary judgment dismissing plaintiff's amended complaint. In her motion, defendant argues that the record now before the court fails to disclose the existence of evidence from which a reasonable factfinder could conclude that any of the constitutional or statutory rights referenced in plaintiff's complaint were violated because 1) she did not act with deliberate indifference to plaintiff's serious medical needs and was not sufficiently involved in any constitutional deprivation alleged to support a finding of liability; 2) plaintiff failed to exhaust his administrative remedies with respect to the claim that defendant failed to treat his diabetes; and 3) in any event she is entitled to qualified immunity from suit.

2

Having carefully considered the arguments asserted in defendant's motion, which plaintiff has opposed, I recommend that it be granted and plaintiff's complaint be dismissed in its entirety.

I.    BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Services ("DOCCS") and is currently serving a sentence of between fifty years and life in prison stemming from a 2007 conviction for robbery and sexual abuse.  *See generally* Am. Compl. (Dkt. No. 45).  At the times the events upon which his claims are predicated occurred, Wesley was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, where he has been confined since December 2007.  Amended Complaint (Dkt. No. 45) ¶ 2; Wesley Decl. (Dkt. No. 63-1) ¶ 2.

In February 2006, while serving a prior sentence in custody of the DOCCS predecessor agency, the New York State Department of Correctional Services, Wesley was diagnosed by Dr. Martin Morell, a consulting rheumatologist, as suffering from Lupus, a chronic auto immune

---

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

disease that can cause painful or swollen joints, fever, fatigue, and rash.[2]

Morell Decl. (Dkt. No. 60-3) ¶¶ 2-4; O'Connor-Ryerson Decl. (Dkt. No. 60-

2) ¶ 19.  Based upon that diagnosis, Dr. Morell prescribed Prednisone, a

synthetic corticosteroid drug used to treat certain inflammatory and auto

immune diseases, to address plaintiff's symptoms.  Morell Decl. (Dkt. No.

60-3) ¶¶ 5-6; O'Connor-Ryerson Decl. (Dkt. N. 60-2) ¶ 23.  Although he

experienced some adverse side effects from the drug, plaintiff took the

prescribed Prednisone between February 2006 and July of 2006, when he

was released from prison.[3]  Morell Decl. (Dkt. No. 60-3) ¶¶ 5, 9, 11;

O'Connor-Ryerson Reply Decl. (Dkt. No. 65-1) ¶ 23; Defendants' Exhs.

(Dkt. No. 60-11) Exh. A (transcript of plaintiff's deposition, hereinafter cited

as "Dep. Tr.") pp. 14-20; Defendants' Exhs. (Dkt. No. 61) Exh. B (plaintiff's

Ambulatory Health Records, hereinafter cited as "Plaintiff's AHR"), at pp.

774-78, 781, 786, 953, 996, 999, 1000, 1001.  Plaintiff stopped taking

---

[2]     Lupus is an auto-immune disease which causes one's immune system to mistakenly attack otherwise healthy body tissue.  The disease "leads to long-term (chronic) inflammation" and is without a known cure.  National Center for Biotechnology Information, U.S. National Library of Medicine, PubMed Health, Systemic lupus erythematosus (February 14, 2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001471 (site last visited October 26, 2011) (screen shot attached); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1093-94 (31st ed.2007).

[3]     Plaintiff was apparently released from prison in July of 2006 in connection with the prior incarceration, but was received back into DOCCS custody on or about November 10, 2006.  Dep. Tr. at p. 16.

4

Prednisone after his release.[4]  Dep. Tr. pp. at 15-16.

Plaintiff was transferred into Auburn on December 10, 2007.  At the time of his arrival at Auburn plaintiff had not taken Prednisone since his release from the prior incarceration in July of 2006.  *Id.* pp. 16-17.  At that time, plaintiff did not request that he be prescribed Prednisone, since he was receiving Ibuprofen, an over-the-counter non-steriodal anti-inflammatory medication.  *Id.* at pp. 17-19; O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 20.

Defendant O'Connor-Ryerson, a Nurse Practitioner employed at Auburn, first saw the plaintiff on December 27, 2007 when he appeared for sick call.  O'Connor-Ryerson Decl. (Dkt No. 60-2) ¶ 18; Plaintiff's AHR at p. 260; Dep. Tr. at p. 22.  In light of plaintiff's prior diagnosis of Lupus in 2006, Nurse Practitioner O'Connor-Ryerson requested an updated rhuemotology consultation for the plaintiff.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶¶ 22, 25; Plaintiff's AHR at pp. 260, 311; Dep. Tr. at p. 22.   On that occasion plaintiff did not request that defendant prescribe Prednisone, and defendant ordered a renewal of plaintiff's prescription for 400 milligrams of Ibuprofen, to be taken orally, as needed, twice daily.

---

[4]        Plaintiff attributes this fact to his inability to arrange for the prescription to be refilled.  *See* Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 63-2) ¶ 8.

O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 21; Plaintiff's AHR at p. 260.

Defendant saw the plaintiff again on January 10, 2008 when he appeared for sick call complaining of multiple symptoms, including a rash on his face, itching, and severe foot fungus with itching and bleeding. O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶¶ 26-27; Plaintiff's AHR at p. 259; Dep. Tr. at pp. 22-23.  To treat those symptoms defendant prescribed various medications including ten milligrams of Prednisone to be taken orally, once a day for two weeks.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 28; Plaintiff's AHR at p. 259; Dep. Tr. at pp. 22-23.

Plaintiff was seen by Dr. Morell at the Walsh Medical Center, located at the Mohawk Correctional Facility, on January 18, 2008.  Morell Decl. (Dkt. No. 60-3) ¶ 12; Plaintiff's AHR at p. 311; Dep. Tr. at p. 24.  As a temporary measure only in light of its significant adverse effects, Dr. Morell ordered that plaintiff's Prednisone dosage be continued at an increased dosage from 10 to 20 milligrams for six weeks until his next consultation with the plaintiff.  Morell Decl. (Dkt. No. 60-3) ¶ 14; Plaintiff's AHR at p. 311; Dep. Tr. at pp. 24-25.  That order was reviewed and initialed on January 24, 2008 by the defendant, who ordered plaintiff's Prednisone dosage be increased in accordance with Dr. Morell's report.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 34; Plaintiff's AHR at p. 258; Dep. Tr. at p.

27.  Plaintiff began receiving the increased dosage of Prednisone on January 26, 2008.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 35; Plaintiff's AHR at p. 391; Dep. Tr. at p. 27.

Plaintiff was seen by Richard Sharples, a nurse employed at Auburn, on January 30, 2008; during that visit plaintiff informed Nurse Sharples that he was no longer taking Prednisone since it was causing adverse side effects.  Sharples Decl. (Dkt. No. 60-4) ¶¶ 4-5; Plaintiff's AHR at p. 257; Dep. Tr. at pp. 29-30.  On that same date, plaintiff submitted a written request that his Prednisone prescription be discontinued.  Payne Decl. (Dkt. No. 60-5) ¶ 6; Plaintiff's AHR at p. 409; Dep. Tr. at pp. 30-31; O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 41.

Plaintiff was again seen by Nurse Practitioner O'Connor-Ryerson on January 31, 2008, an appointment that was scheduled by Nurse Sharples. O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 42; Plaintiff's AHR at p. 257.  At that time, Wesley advised Nurse Practitioner O'Connor-Ryerson that he had stopped taking Prednisone due to the side effects he was experiencing.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 43; Plaintiff's AHR at p. 257.  Defendant subsequently authorized the discontinuance of plaintiff's Prednisone prescription.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 46; Plaintiff's AHR at p. 257.  As a result, between February 1, 2008 and

7

April 6, 2008 plaintiff did not receive Prednisone, and instead was given

400 milligrams of Motrin, a brand of Ibuprofen, twice daily.[5]  O'Connor-

Ryerson Decl. (Dkt. No. 60-2) ¶¶ 20, 47; Plaintiff's AHR at pp. 386, 389,

399, 400.

Plaintiff underwent a follow-up consultation with Dr. Morell on April

11, 2008.  Morell Decl. (Dkt. No. 60-3) ¶ 16; Plaintiff's AHR at p. 293; Dep.

Tr. at p. 35.  When asked during that examination if he was still taking

Prednisone, plaintiff responded that he had discontinued the medication as

a result of its adverse side effects.  Morell Decl. (Dkt. No. 60-3) ¶ 17;

Plaintiff's AHR at p. 293; Dep. Tr. at pp. 35-36, 55.  In a report of that

consultation Dr. Morell noted that plaintiff "does not tolerate Prednisone."

Plaintiff's AHR at p. 293 (emphasis in original); Morell Decl. (Dkt. No. 60-3)

¶ 18.  That report was reviewed and initialed by defendant O'Connor-

Ryerson on or about April 14, 2008.  O'Connor-Ryerson Decl. (Dkt. No. 60-

2) ¶ 55; Plaintiff's AHR at p. 293.

On April 13, 2008, plaintiff was admitted to Upstate Medical Center,

located in Syracuse, New York, after having complained of severe chest

––––––––––––––––––––

[5]      Plaintiff's dosage of Motrin was increased by defendant O'Connor-
Ryerson on or about April 7, 2008 from 400 milligrams twice daily to 600 milligrams
three times per day.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶¶ 49-50; Plaintiff's AHR
at p. 253.  At that time, plaintiff reiterated to the defendant that he had stopped taking
Prednisone because of his dislike for its side effects.  *Id.*

pains.  Sharples Decl. (Dkt. No. 60-4) ¶ 11; Plaintiff's AHR at pp. 251, 322-23, 328; Dep. Tr. at pp. 52-53.  Upon his discharge from the hospital on May 8, 2008 plaintiff was prescribed 60 milligrams of Prednisone.  *Id.*

On June 9, 2008, plaintiff was seen by Nurse Sharples at sick call. Sharples Decl. (Dkt. No. 60-4) ¶ 8; Plaintiff's AHR at p. 246; Dep. Tr. at p. 45, 47-48.  On that occasion plaintiff complained the sun was too hot and bothered his skin and requested to see a physician, which he was already scheduled to do on June 21, 2008.  Sharples Decl. (Dkt. No. 60-4) ¶ 9; Plaintiff's AHR at p. 246.  According to the plaintiff, on that occasion Nurse Sharples informed him that defendant O'Connor-Ryerson previously stated to Nurse Sharples that whatever symptoms the plaintiff was experiencing were of no real concern.[6]  Amended Complaint (Dkt. No. 45) ¶ 8; Dep. Tr. at pp. 46, 48-49, 52, 88.

Plaintiff received the prescribed 60 milligrams of Prednisone daily, pursuant to orders from Upstate Medical Center, between May 10, 2008 and June 10, 2008.  Sharples Decl. (Dkt. No. 60-4) ¶ 11; Plaintiff's AHR at pp. 322-23, 328, 365, 376.  Nurse Sharples submitted to defendant O'Connor-Ryerson a refill order for plaintiff's Prednisone on June 10, 2008.

---

[6]       Nurse Sharples flatly denies having made any such statement.  Sharples Decl. (Dkt. No. 60-4) ¶¶ 14-20.

Sharples Decl. (Dkt. No. 60-4) ¶ 13; O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶¶ 56, 62; Plaintiff's AHR at p. 246.  Defendant ordered plaintiff's Prednisone prescription discontinued on June 10, 2008, noting that plaintiff is "unable to tolerate Prednisone per clinic."[7]  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶¶ 64; Plaintiff's AHR at p. 246.

On June 13, 2008, plaintiff was seen at sick call by Nurse Sharples; during that visit plaintiff requested that his Prednisone prescription be reinstated.  Sharples Decl. (Dkt. No. 60-4) ¶¶ 21-22; Plaintiff's AHR at p. 245; Dep. Tr. at p. 56.  Plaintiff's Prednisone prescription was subsequently restored on June 19, 2008 by Dr. Pang Kooi, the Health Services Director at Auburn.  Kooi Decl. (Dkt. No. 60-7) ¶¶ 6-8; Plaintiff's AHR at p. 245; Dep. Tr. at pp. 62-67, 92-94.  Despite its availability on that date, plaintiff did not actually begin taking the Prednisone until June 30, 2008.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 74; Plaintiff's AHR at pp. 361-365.

On July 29, 2008, plaintiff presented at emergency sick call at Auburn, complaining of having regurgitated something resembling coffee

_____

[7]      Whether defendant was aware on June 10, 2008 that plaintiff had been prescribed Prednisone upon his discharge from the Upstate Medical Center in May, 2008 is a matter that is sharply contested.  *Contrast* O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 65 and Defendants' Local Rule 7.1(a)(3) Statement ¶ 65 *with* Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 63-2) ¶ 65.

grounds.[8]  Amended Complaint (Dkt. No. 45) ¶ 12; Wesley Decl. (Dkt. No. 63-1) ¶ 35.  On that occasion plaintiff was sent to University Medical Center, where he was diagnosed with diabetic ketoacidosis and pancreatitis.  *Id.; see also* Plaintiff's Exhs. (Dkt. No. 63-4) Exh. G.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on September 9, 2008, naming Nancy O'Connor-Ryerson as a defendant, both individually and in her official capacity as a nurse practitioner at Auburn.  Compl. (Dkt. No. 1). Plaintiff's initial complaint set forth a single cause of action, alleging deliberate medical indifference to his serious medical needs, in violation of the Eighth and Fourteenth Amendments, arising out of defendant's decision to discontinue his Prednisone prescription in June of 2008.  *Id*. After commencing this action, plaintiff was granted *in forma pauperis* status.  Dkt. No. 4.

Following service of process, *see* Dkt. No. 5, in lieu of filing an answer, defendant moved on November 17, 2008 for dismissal of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

---

[8]      Although plaintiff alleges he presented at emergency sick call on July 29, 2008, the hospital discharge summary attached to his affidavit submitted in opposition to defendant's motion shows that he was admitted to the hospital on July 31, 2008. Plaintiff's Exhs. (Dkt. No. 63-4) G.

Procedure, arguing that 1) the complaint fails to state a cognizable Eighth

Amendment claim; 2) defendant is entitled to qualified immunity from suit

for damages in her individual capacity; and 3) and any claim against

defendant in her official capacity is barred by the Eleventh Amendment.

That motion resulted in my issuance of a report on February 25, 2010

recommending that it be denied in part and granted in part. *See* Dkt. No.

12. My recommendation was adopted in its entirety by Chief Judge

Norman A. Mordue by decision and order dated July 7, 2009. Dkt No. 15.

In accordance with that decision and order, plaintiff's claim against

defendant in her official capacity was dismissed, but defendant's motion

was otherwise denied. *Id.*

On July 14, 2010, with court permission, *see* Dkt. No. 44, plaintiff

filed an amended complaint reiterating his initial claim against the

defendant in her individual capacity and adding a claim that defendant

failed to recognize symptoms of diabetic ketoacidosis and render

appropriate treatment**.** Dkt. No. 45.

After the filing of an answer by the defendant on August 23, 2010

denying the allegations against her and asserting various defenses, *see*

Dkt. No. 20, Chief District Judge Norman A. Mordue issued an order

staying the case and referring the matter for settlement proceedings

pursuant to the district *pro se* prisoner settlement program.  Dkt. No. 51.  A

mediation session thereafter was conducted by Magistrate Judge Victor E.

Bianchini on November 29, 2010; unfortunately, however, the parties were

unable to resolve the matter through mediation.

On April 14, 2011, following the close of discovery, defendant moved

for summary judgment dismissing plaintiff's amended complaint.  Dkt. No.

60.  In her motion, defendant argues that 1) she did not act with deliberate

indifference to plaintiff's serious medical needs; 2) she is entitled to

qualified immunity from suit; and 3) plaintiff failed to exhaust his

administrative remedies with respect to his claims relating to diabetic

ketoacidosis.  *Id.*

Defendant's motion for summary judgment, which was timely

opposed by plaintiff, *see* Dkt. Nos. 63, 66, is now ripe for determination,

and has been referred to me for a report and recommendation, pursuant to

28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).[9]  *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

---

[9]      On July 25, 2011, plaintiff filed a letter brief in response to defendant's
reply.  Dkt. No. 66.  Although surreplies generally are not permitted under the court's
local rules, unless prior permission is granted, in deference to his *pro se* status, and
without detracting from the importance of complying with the court's local rules, the
court has considered plaintiff's surreply.

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect the

outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248,

106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute

"if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477

U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to

special latitude when defending against summary judgment motions, they

must establish more than mere "metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168

F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider

whether *pro se* plaintiff understood nature of summary judgment process).

        When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.

Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is

warranted only in the event of a finding that no reasonable trier of fact

could rule in favor of the non-moving party.  *See Building Trades

Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

   B.   Deliberate Indifference

   Defendant's motion for summary judgment initially challenges the

merits of plaintiff's claims, asserting that plaintiff does not suffer from a

serious medical need and that she did not act with deliberate indifference

with regard to plaintiff's medical conditions.  Arguing that plaintiff's medical

indifference claim represents nothing more than an outgrowth of his

disagreement with medical officials at Auburn over the care and treatment

he received at the facility, defendant maintains that the claim is legally

deficient and should be dismissed on the merits as a matter of law.

   Claims that prison officials have intentionally disregarded an inmate's

medical needs fall under the umbrella of protection afforded by the Eighth

Amendment against the imposition of cruel and unusual punishment.

*Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976).

The Eighth Amendment prohibits punishment that involves the

"unnecessary and wanton infliction of pain" and is incompatible with "the

evolving standards of decency that mark the progress of a maturing

society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct.

1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment

does not mandate comfortable prisons, neither does it tolerate inhumane

treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832,

114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337,

349, 101 S.Ct. 2392, 2400 (1981)).  To satisfy their obligations under the

Eighth Amendment, prison officials must "ensure that inmates receive

adequate food, shelter, and medical care, and must take reasonable

measures to guarantee the safety of inmates."  *Farmer*, 511 U.S. at 832,

114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104

S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth

Amendment by inflicting cruel and unusual punishment must satisfy both

objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268

(2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL

889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[10]  Addressing the objective

element, to prevail a plaintiff must demonstrate a violation sufficiently

serious by objective terms, "in the sense that a condition of urgency, one

that may produce death, degeneration, or extreme pain exists."  *Hathaway*

*v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the

subjective element, a plaintiff must also demonstrate that the defendant

---

[10]     Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

### 1.   Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin*, 467 F.3d at 279.  A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id*. at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, plaintiff's claim is that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is

an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may instead properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that

19

"'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

It is undeniable that Lupus is generally regarded as a serious medical condition. *See Baez v. Dep't of Corr.*, Civil Action 2:06-CV-04923, 2009 WL 1183910, at *7 (E.D. Pa. May 4, 2009) (recognizing that "[s]ystemic lupus can be fatal."); *see also Brown v. White,* No. CV-06-0196-MWL, 2007 WL 1309544, at *5 (E.D. Wash. May 4, 2007) ("'serious medical needs' include 'diseases such as asthma, hypertension, epilepsy, diabetes, tuberculosis and lupus.'") (citations omitted).  This alone, however, is insufficient to satisfy the objective of the prong of the deliberate indifference test where, as here, plaintiff has been treated for the condition but alleges a hiatus or interruption in treatment.  In such a case, as was previously noted, the focus of the objective prong is on the challenged delay and whether, objectively, the temporary denial of treatment – in this case administering Prednisone – was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.

In this instance, no reasonable factfinder could conclude that the failure to renew plaintiff's Prednisone prescription on June 10, 2008 was

unreasonable and sufficiently harmful to plaintiff to constitute a constitutional violation.  The record before the court establishes that plaintiff had voluntarily discontinued his Prednisone in or about January of 2008, advising prison medical personnel, including defendant, that he could not tolerate the side effects of the drug; at that time, plaintiff discontinued usage of the Prednisone for a period of approximately three months until his discharge from the hospital in early May 2008. Furthermore, defendant has shown that her failure to refill plaintiff's prescription on June 10, 2008 was based, at least in part, upon his voluntary discontinuance of the medication earlier in the year.  The resulting interruption in treatment plaintiff lasted for a period of only eight days, until June 19, 2008, when plaintiff was placed back on Prednisone by Dr. Kooi, and plaintiff has produced no evidence demonstrating that during this very brief hiatus in taking the Prednisone his condition deteriorated or he that he suffered to such an extent to raise constitutional concerns.  In other words, based upon the evidence before the court, no reasonable juror could conclude that the eight-day delay in restarting plaintiff's Prednisone prescription was sufficiently serious to meet the objective prong of the deliberate indifference test.

As was previously noted, plaintiff's amended complaint interjected

another component into plaintiff's deliberate indifference claim, surrounding

the failure of prison officials to properly diagnose his diabetic ketoacidosis

and pancreatitis, which led to his hospitalization on July 31, 2008.  This

alleged refusal on the part of defendant to provide treatment for that

condition satisfies the objective prong of the deliberate indifference test.

2.   Subjective Element

The second, subjective, requirement for establishing an Eighth

Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of

one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson*

*v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)).  Deliberate

indifference, in a constitutional sense, exists if an official "knows of and

disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he [or she] must also draw the

inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,*

103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*);

*Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct.

1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a

mental state equivalent to subjective recklessness as the term is used in

22

criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

The Eighth Amendment does not afford plaintiff a right to the medical treatment of his choosing.  The question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted).  Because prison medical staff are afforded wide discretion in formulating treatment plans for their wards, their decisions are entitled to a presumption of correctness.  *Williams v. Smith*, 2009 WL 2431948, at *9 (S.D.N.Y. 2009) (citing *Kulak v. City of New York*, 88 F.3d 63, 77 (2d Cir. 1996)).

Further, mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action.  *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 292; *Chance*, 143 F.3d at 703.  "Medical malpractice does not become a

constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292.  Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference.  *Harrison*, 219 F.3d at 139.  If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference.  *Harrison*, 219 F.3d at 138; *Kearsey v. Williams*, No. 99 Civ 8646, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

Even assuming that plaintiff can satisfy the objective prong, his deliberate indifference claim nonetheless fails because the record is devoid of any support for the notion that the defendant was deliberately indifferent to plaintiff's medical condition.  Addressing first the discontinuance of plaintiff's Prednisone, defendant O'Connor-Ryerson explains that she declined a Prednisone refill order from plaintiff on June 10, 2008 based upon her belief that plaintiff was not able to tolerate the side effects of that medication and his voluntary discontinuance of the medication on January 30, 2008.  O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶ 76; Plaintiff's AHR at pp. 246, 311.  At the time she made that decision O'Connor-Ryerson was

unaware that another medical provider had prescribed for plaintiff sixty milligrams of Prednisone, which he had been taking since May 10, 2008. O'Connor-Ryerson Decl. (Dkt. No. 60-2) ¶¶ 56, 59-60.  As a result defendant's refusal to refill the prescription, plaintiff was without Prednisone for a period of eight days.  Accordingly, even assuming that defendant O'Connor-Ryerson acted improperly in refusing to refill the Prednisone prescription, at most the error constitutes negligence, which is not actionable under section 1983.  *See Holmes v. Fell,* 856 F. Supp. 181, 183 (S.D.N.Y. Jun. 24, 1994) (holding that a nurse's failure to review inmate's medical records may have been a lack of due care, the failure to review was insufficient to generate a claim for medical indifference under the Eighth Amendment); *but see Smith v. Public Admin. of Suffolk Cnty.*, No. 06 CV 3740(CBA)(LB), 2009 WL 2843281, at *7 (E.D.N.Y. Aug. 31, 2009) (" . . . defendants' failure to review plaintiff's *recent* medical records . . . constitutes deliberate indifference.") (emphasis in original).

The second element of plaintiff's deliberate indifference claim is similarly deficient.  Plaintiff's theory appears to be that on June 7, 2008, while attending emergency sick call, he described symptoms that should have been discerned by prison officials as stemming from diabetic ketoacidosis, a condition prison officials failed to treat.  The record,

however, is devoid of evidence suggesting defendant O'Connor-Ryerson's

involvement in or awareness of the symptomology attributed to that

condition.  It is axiomatic that personal involvement in a constitutional

deprivation it is essential to a finding of liability against an individual for

damages.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt*

*v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v.*

*Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087,

98 S. Ct. 1282 (1978)).   In this instance, the record reflects that while

plaintiff may have described certain symptoms to Nurse Joanne Guziwicc-

Reilley on June 7, 2008, the report of those symptoms was not passed

along to defendant O'Connor-Ryerson.[11]  *See* Guzewicz-Reilley (Dkt. 60-6)

¶ 10.  In light of the lack of evidence in the record suggesting defendant

O'Connor-Ryerson's awareness of symptoms consistent with diabetic

ketoacidosis and failure to provide medical attention, plaintiff has failed to

satisfy the subjective prong of the deliberate indifference test as to this

claim as well.[12]

---

[11]    According to Nurse Guzewicz-Reilley, based upon her professional opinion there is nothing from the symptoms described by plaintiff on that date to suggest, as a source of his complaints, a diagnosis of diabetic ketoacidosis; instead, the symptoms were regarded by Nurse Guzewicz-Reilley as a manifestation of hypertension.  Guzewicz-Reilley Decl. (Dkt. No. 60-6) ¶ 12.

[12]    Plaintiff has not explained in his papers why Dr. Kooi, who he saw on June 19, 2008, was not told of the symptoms and is not being criticized for his failure to

In sum, I find that no reasonable factfinder could conclude that defendant acted with deliberate indifference to plaintiff's serious medical needs.  I therefore recommend that the court grant defendant's motion on the merits as to plaintiff's cause of action asserted under the Eighth Amendment.

D.    Failure to Exhaust

In her motion, defendant alleges that although plaintiff filed a grievance with respect to his original claim, he failed to file a grievance with respect to his new claim that defendant failed to treat his diabetic ketoacidosis.  As a procedural matter, defendant contends that plaintiff is therefore precluded from judicial pursuit of these claims based upon his failure to comply with the exhaustion requirement of 42 U.S.C. § 1997e(a).

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]"  *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights

---

diagnose plaintiff's diabetic ketoacidosis.

actions.  An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record."  *Jones v. Bock,* 549 U.S. 199, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122 S. Ct. at 992 (citation omitted).

In the event a defendant named in such an action establishes that

the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis omitted).

The primary mechanism made available to New York state prison inmates for presenting grievances concerning prison conditions is the Inmate Grievance Program ("IGP") established by the DOCCS and recognized by the courts as an "available" remedy for purposes of the PLRA. *See  Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4

(S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).

The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[13]  7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* at §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* at § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* at § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

─────────────────

[13]    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

In support of her claim, defendant has submitted a declaration by Cheryl Parmiter, the Inmate Grievance Supervisor at Auburn.  Parmiter Decl. (Dkt. No. 60-8) ¶ 1.  Ms. Parmiter discloses that while plaintiff exhausted all administrative remedies regarding the discontinuance of his Lupus medication, he did not file and pursue to the final step a grievance under the IGP regarding defendant's alleged failure to treat diabetic ketoacidosis.  *Id.* at ¶ 11, 18-19.

In his amended complaint, plaintiff admits that he did not file a grievance "about not being treated for diabetic ketoacidosis because plaintiff did not know he had diabetes at the time."  *See* Plaintiff's Memorandum of Law (Dkt. No. 63) p. 17.  This fact is confirmed by a review of the grievance, which clearly reflects that it centers upon the discontinuation of his Lupus medication and being advised of its side effects.  *See* Plaintiff's Exhibits (Dkt. No. 63-4) Exh. I.

To be sure, there are circumstances under which an inmate's failure to file a proper grievance before commencing suit may be overlooked and not relied upon as a basis for dismissal of his or her federal claims.  *See Macias,* 495 F.3d at 44-45; *Hemphill v. New York*, 380 F.3d 680, 688-89 (2d Cir. 2004).  In this case, however, plaintiff has not provided the court with any basis to excuse the requirement of exhaustion in this case.

31

As was previously noted, failure to exhaust represents an affirmative defense which must be raised and proven by a defendant in an action brought by a prison inmate. *Jones*, 459 U.S. at 212, 127 S. Ct. at 919; *Mendez v. Barlow*, No. 04-CV-1030S, 2008 WL 2039499, at *3 (W.D.N.Y. May 12, 2008) (citing *Johnson*, 380 F.3d at 695 and *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999)). In this instance, defendant has satisfied his burden of establishing the lack of any genuine issue of material fact concerning plaintiff's failure to exhaust available administrative remedies by grieving one or more of the matters now at issue. I therefore recommend dismissal of plaintiff's claims related to failure to diagnose and treat his ketoacidosis on this additional, procedural basis.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff claims that the eight-day lapse in receiving Prednisone resulting from defendant's discontinuance of his prescription on June 10, 2008 violated his Eighth Amendment rights. The record now before the court, however, fails to reflect that defendant O'Connor-Ryerson was deliberately indifferent to his medical condition. At most, plaintiff has raised a claim for negligence, presenting an insufficient basis to find a violation of the Eighth Amendment. To the extent that plaintiff now complains of a failure of prison officials at Auburn to detect and treat his

32

diabetic ketoacidosis, that claim is both procedurally barred based upon his failure to exhaust available administrative remedies, and in any event fails as a matter of law based upon a lack of any showing of O'Connor-Ryerson's participation in the violation and subjective disinterest in his condition.  Accordingly, it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 60) be GRANTED, and that the claims in plaintiff's amended complaint be DISMISSED, with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     October 27, 2011
           Syracuse, NY

U.S. National Library of Medicine - The World's Largest Medical Library

 **PubMed Health**

About PubMed Health | Home | Help

 SHARE

Home > Diseases and Conditions > Systemic lupus erythematosus

 Print

A.D.A.M. Medical Encyclopedia.

# Systemic lupus erythematosus

**Disseminated lupus erythematosus; SLE; Lupus; Lupus erythematosus; Discoid lupus**

Last reviewed: February 14, 2011.

Systemic lupus erythematosus (SLE) is a long-term autoimmune disorder that may affect the skin, joints, kidneys, brain, and other organs.

## Causes, incidence, and risk factors

Systemic lupus erythematosus (SLE) is an autoimmune disease, which means the body's immune system mistakenly attacks healthy tissue. This leads to long-term (chronic) inflammation.

The underlying cause of autoimmune diseases is not fully known.

SLE is much more common in women than men. It may occur at any age, but appears most often in people between the ages of 10 and 50. African Americans and Asians are affected more often than people from other races.

SLE may also be caused by certain drugs. For information on this cause, see Drug-induced lupus erythematosus

## Symptoms

Symptoms vary from person to person, and may come and go. Almost everyone with SLE has joint pain and swelling. Some develop arthritis. Frequently affected joints are the fingers, hands, wrists, and knees.

Other common symptoms include:

- Chest pain when taking a deep breath
- Fatigue
- Fever with no other cause
- General discomfort, uneasiness, or ill feeling (malaise)
- Hair loss
- Mouth sores
- Sensitivity to sunlight
- Skin rash -- a "butterfly" rash over the cheeks and bridge of the nose affects about half of people with SLE. The rash gets worse in sunlight. The rash may also be widespread.
- Swollen lymph nodes

Other symptoms depend on what part of the body is affected:

- Brain and nervous system: headaches, numbness, tingling, seizures, vision problems, personality changes

### What works? 

Cyclophosphamide versus methylprednisolone for lupus
Does cyclophosphamide work to treat central nervous system lupus (neuropsychiatric lupus)?

See all (8)...

### Figures 








### Drugs of interest 

Hydroxychloroquine

Prednisone

Aspirin

Belimumab Injection

Cyclophosphamide

See all...

### Read More 

Autoimmune disorders

Antibody

Drug-induced lupus erythematosus

Joint pain

Arthritis

- Digestive tract: abdominal pain, nausea, and vomiting
- Heart: abnormal heart rhythms (arrhythmias)
- Lung: coughing up blood and difficulty breathing
- Skin: patchy skin color, fingers that change color when cold (Raynaud's phenomenon)

Some patients only have skin symptoms. This is called discoid lupus.

## Signs and tests

To be diagnosed with lupus, you must have 4 out of 11 typical signs of the disease.

Your doctor will perform a physical exam and listen to your chest with a stethoscope. An abnormal sound called a heart friction rub or pleural friction rub may be heard. A nervous system exam will also be done.

Tests used to diagnose SLE may include:

- Antibody tests, including antinuclear antibody (ANA) panel
- CBC
- Chest x-ray
- Kidney biopsy
- Urinalysis

This disease may also alter the results of the following tests:

- Antithyroglobulin antibody
- Antithyroid microsomal antibody
- Complement components (C3 and C4)
- Coombs' test - direct
- Cryoglobulins
- ESR
- Kidney function blood tests
- Liver function blood tests
- Rheumatoid factor

This list is not all inclusive.

## Treatment

There is no cure for SLE. The goal of treatment is to control symptoms.

Mild disease may be treated with:

- Nonsteroidal anti-inflammatory medications (NSAIDs) treat arthritis and pleurisy
- Corticosteroid creams to treat skin rashes
- An antimalaria drug (hydroxychloroquine) and low-dose corticosteroids for skin and arthritis symptoms

You should wear protective clothing, sunglasses, and sunscreen when in the sun.

Severe or life-threatening symptoms (such as hemolytic anemia, extensive heart or lung involvement, kidney disease, or central nervous system involvement) often require more aggressive treatment by doctor specialists.

Treatment for more severe lupus may include:

Rashes

Nodules

Lupus nephritis

Acute kidney failure

Confusion

Seizures

Psychosis

Organic brain syndrome

Headache

Blood clots

Pulmonary embolus

Lupus anticoagulants

Platelet count

Pericarditis

Endocarditis

Myocarditis

Chest pain

Heart palpitations

Pleurisy

Pleural effusion

Breathing difficulty

Thrombocytopenia

Hemolytic anemia

 

Lupus

MedlinePlus.gov links to free, reliable, up-to-date health information from the National Institutes of Health (NIH) and other trusted health organizations.

## Recent activity



Turn Off    Clear

 Systemic lupus erythematosus

PubMed Health

See more...

- High-dose corticosteroids or medications to decrease the immune system response

- Cytotoxic drugs (drugs that block cell growth) if you do not get better with corticosteroids, or whose symptoms get worse when the stop taking them. These medicine have serious, severe side effects. You should be closely monitored by your doctor.

If you have lupus, it is also important to have:

- Preventive heart care

- Up-to-date immunizations

- Tests to screen for thinning of the bones (osteoporosis)

Talk therapy and support groups may help relieve depression and mood changes that may occur in patients with this disease.

## Support Groups

See: Lupus resources

## Expectations (prognosis)

How well a person does depends on the severity of the disease.

The outcome for people with SLE has improved in recent years. Many people with SLE have mild symptoms.

Women with SLE who become pregnant are often able to carry safely to term and deliver a healthy infant, as long as they do not have severe kidney or heart disease and the SLE is being treated appropriately. However, the presence of SLE antibodies may increase the risk of pregnancy loss.

## Complications

Some people with SLE have abnormal deposits in the kidney cells. This leads to a condition called lupus nephritis. Patients with this condition may eventually develop kidney failure and need dialysis or a kidney transplant.

SLE causes damage to many different parts of the body, including:

- Blood clots in the legs (deep vein thrombosis) or lungs (pulmonary embolism)

- Destruction of red blood cells (hemolytic anemia) or anemia of chronic disease

- Fluid around the heart (pericarditis), endocarditis, or inflammation of the heart (myocarditis)

- Fluid around the lungs (pleural effusions) and damage to lung tissue

- Pregnancy complications, including miscarriage

- Stroke

- Severely low blood platelets (thrombocytopenia)

- Inflammation of the blood vessels

## Calling your health care provider

Call your health care provider if you have symptoms of SLE. Also, call if you have this disease and your symptoms get worse or a new one occurs.

## References

1. Ruiz-Irastorza G, Ramos-Casals M, Brito-Zeron P, Khamashta MA. Clinical efficacy and side effects of antimalarials in systemic lupus erythematosus: a

systematic review. *Ann Rheum Dis.* 2010;69:20-28.

2. Hahn BH, Tsao BP. Pathogenesis of systemic lupus erythematosus. In: Firestein GS, Budd RC, Harris ED Jr., et al., eds. *Kelley's Textbook of Rheumatology.* 8th ed. Philadelphia, Pa: Saunders Elsevier; 2008:chap 74.

Review Date: 2/14/2011.

Reviewed by: Michael E. Makover, MD is a professor and attending in rheumatology at the New York University Medical Center, New York, NY. Review provided by VeriMed Healthcare Network. Also reviewed by David Zieve, MD, MHA, Medical Director, A.D.A.M., Inc.



A.D.A.M., Disclaimer

Copyright © 2011, A.D.A.M., Inc.

   

National Center for Biotechnology Information, U.S. National Library of Medicine

8600 Rockville Pike, Bethesda MD, 20894 USA

In partnership with:

       



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:
(1) there was no evidence that administrative remedy was
available to inmate;
(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;
(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;
(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;
(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;
(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;
(7) sheriff was not liable under § 1983; but
(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 🔑 **25**

170A Federal Civil Procedure
   170AI In General
      170AI(B) Rules of Court in General
         170AI(B)1 In General
            170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ☞ 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ☞ 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ☞ 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ☞ 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ☞ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner
in a particular prison or prison system, and whether such
remedy was applicable to grievance underlying prisoner's
suit, for purpose of PLRA's exhaustion requirement, are
not questions of fact; rather, such issues either are, or
inevitably contain, questions of law. Prison Litigation
Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).


[9] Civil Rights 78 ☞ 1319


78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff and prison medical staff provided no evidence that
an administrative remedy was available to inmate who
suffered from end state renal disease, and who sought, but
did not receive, medical testing to determine if he was a
candidate for kidney transplant, and thus inmate's § 1983
action alleging violations of Eighth Amendment would not
be dismissed for his failure to exhaust administrative
remedies under PLRA; defendants failed to establish
procedural framework for grievance resolution at the
prison or the availability of any administrative remedies
for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison
Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. §
1997e(a).


[10] Sentencing and Punishment 350H ☞ 1533


350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in
general. Most Cited Cases
Test for determining whether prison official's actions or
omissions rise to level of "deliberate indifference" in
violation of the Eighth Amendment, as will allow recovery
by prisoner in federal civil rights action, is twofold: first,
prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and
second, prisoner must demonstrate that defendant prison
officials possessed sufficient culpable intent. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.


[11] Sentencing and Punishment 350H ☞ 1533


350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in
general. Most Cited Cases
Second prong of test for determining whether prison
officials acted with deliberate indifference to rights of
prisoners in violation of the Eighth Amendment, that of
"culpable intent," in turn involves two-tier inquiry;
specifically, prison official has sufficient culpable intent
if he has knowledge that inmate faces substantial risk of
serious harm and he disregards that risk by failing to take
reasonable measures to abate harm. U.S.C.A.
Const.Amend. 8.


[12] Sentencing and Punishment 350H ☞ 1546


350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most
Cited Cases
Mere fact that an inmate's underlying disease is a "serious
medical condition" does not mean that prison staff's
allegedly incorrect treatment of that condition
automatically poses an "objectively serious health risk," in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8.


[13] Prisons 310 ☞ 192


310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🔑    1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🔑    192

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑    1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🔑    1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🔑    192

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑    1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🔑    2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H 👈 1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A 👈 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 👈 1355

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 👈 1358

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A 👈 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 🔑 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A 🔑 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

**I. FACTS**

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See* Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also* Hailey v. N.Y. City Transit Auth., 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (Id. at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (Id. at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (See, e.g., id. at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; see also Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (See Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**352 an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for pro se litigants opposing summary judgment motions. See Irby v. N.Y. City Transit Auth., 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported *353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:08-cv-00953-NAM-DEP   Document 67   Filed 10/27/11   Page 49 of 138

Page 12

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir.2003); see also Espinal, 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." See Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." Id. at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. See, e.g., Abney v. County of Nassau, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.FN12 Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. See id. at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that Abney, 380 F.3d 663, was decided before Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- Woodford. However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** _Hayes,_ 84 F.3d at 620 (internal citation omitted); _see also_ _Phelps v. Kapnolas,_ 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In _Salahuddin v. Goord,_ the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); _see also_ _Jones v. Westchester County Dep't of Corr. Medical Dep't,_ 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm
must be substantial and the official's actions more than
merely negligent.

*Salahuddin, 467 F.3d at 280* (citations and quotation
marks omitted); *see also Jones, 557 F.Supp.2d at 414.* The
Supreme Court has stressed that

in the medical context, an inadvertent failure to provide
adequate medical care cannot be said to constitute "an
unnecessary and wanton infliction of pain" or to be
"repugnant to the conscience of mankind." Thus, a
complaint that a physician has been negligent in
diagnosing or treating a medical condition does not state
a valid claim of medical mistreatment under the Eighth
Amendment. Medical malpractice does not become a
constitutional violation merely because the victim is a
prisoner. In order to state a cognizable claim, a prisoner
must allege acts or omissions sufficiently harmful to
evidence deliberate indifference to serious medical
needs. It is only such indifference that can offend
"evolving standards of decency" in violation of the
Eighth Amendment.

*Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 50
L.Ed.2d 251 (1976)* (internal citations omitted); *see also
Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003)* ("A
showing of medical malpractice is therefore insufficient to
support an Eighth Amendment claim unless the
malpractice involves culpable recklessness, i.e., an act or
a failure to act by the prison doctor that evinces a
conscious disregard of a substantial risk of serious harm."
(internal quotations omitted)); *Harrison v. Barkley, 219
F.3d 132, 139 (2d Cir.2000)* (a medical practitioner who
"delay[s] ... treatment based on a bad diagnosis or
erroneous calculus of risks and costs" does not evince the
culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth
Amendment rights by: (1) prescribing an incorrect dosage
of his renal disease medication; (2) failing to have him
tested for the kidney transplant list; and (3) failing to
properly treat his shoulder pain. The Court considers each
claim in turn and, for the reasons discussed below,
concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication
dosage and on all of plaintiff's claims against Sheriff
Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is
serious (Defs.' Br. at 21), but argue that the dosage of
Renagel and PhosLo prescribed for plaintiff did not result
in any injury. Defendants also argue that, even if the
dosage was incorrect, it was at most "an error in medical
judgment." Finally, defendants argue that plaintiff cannot
show deliberate indifference because defendants
continually tested plaintiff and twice changed the dosage
of his medication depending on his phosphorous levels.
(Defs.' Br. at 22.) For the reasons set forth below, the
Court agrees and concludes that no rational jury could find
that defendants acted with deliberate indifference with
respect to the prescription*359 of medication for
plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence
that the allegedly incorrect medication dosage posed an
objectively serious risk to plaintiff's health. As a threshold
matter, the mere fact that plaintiff's underlying renal
disease is a serious medical condition does not mean that
the allegedly incorrect treatment for that condition poses
an objectively serious health risk. *See Smith v. Carpenter,
316 F.3d 178, 186-87 (2d Cir.2003)* ("As we noted in
*Chance [v. Armstrong, 143 F.3d 698 (2d Cir.1998)* ], it's
the particular risk of harm faced by a prisoner due to the
challenged deprivation of care, rather than the severity of
the prisoner's underlying medical condition, considered in
the abstract, that is relevant for Eighth Amendment
purposes."). Furthermore, plaintiff has failed to produce
any evidence that his medication dosage at the NCCC
caused him any objectively serious harm. Instead, plaintiff
testified merely that the prescribed dosage was "wrong"
and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's
belief that the medication dosage was incorrect is
insufficient to establish the objective prong of the
deliberate indifference test.[FN14] *See Fox v. Fischer, 242
Fed.Appx. 759, 760 (2d Cir.2007)* ("[T]he fact that
[plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> **FN13.** Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> **FN14.** Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at \*11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> **FN15.** In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> **FN16.** Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See* Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008) (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See* Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing Estelle, 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g.,* Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010) ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009) ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See* Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007) ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also* Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000) ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); Fuller, 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g.,* Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009) ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

#### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984)] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363 regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative. FN18 However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. FN19 (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364 Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve [plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003)* ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009)* ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004)* ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna, 386 F.3d at 437* (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007)* ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna, 386 F.3d at 437*)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)


### V. CONCLUSION


For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.


SO ORDERED.


E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
No. CIV.9:00CV0744DNHGLS.

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

    FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, pro se, Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

    FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

    FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

    FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' " *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain.' " ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi[FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1183910 (E.D.Pa.)

(Cite as: 2009 WL 1183910 (E.D.Pa.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. Pennsylvania.
Orlando BAEZ, CB-3721
v.
DEPARTMENT OF CORRECTIONS, S.C.I. Greene
County Prison, Stanley Falor, Diane Manson, John
Mcanany, M.S. Reese, Shirley Hickman, Michelle
Diggs, Nancy Ziegler, Unbanti Talabi, Louis Folino,
Diane Thomas, Dan Davis, Sharon Burks, Clifford
O'hara, Donald Vaughn, Jeffery Beard, Brenda Martin,
Byunchak Jin, Debra Gress, Mary Balestrieri, Tammy
Hooker, Robert Dietz, Kristin Kersing, Thomas James,
Majorie J. Fox, Francis Suppok, S.C.I. Graterford
Prison, Felipe Arias, Koseriowski, Eakin, Cusick,
Stefanic, Myron Stanshefski, Julie Knauer, Wendy
Moyer, Thomas Stachelek, J. Murry, Gary Olinger,
Cherian Joseph, Richard Votyko, Harmon Crup, Frank
Masino, David Diguglielmo, James Opalka, J. Baker.
Civil Action 2:06-CV-04923.

May 4, 2009.
West KeySummary**Prisons 310** 🔑 **192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
    Prison doctors were not deliberately indifferent to the
serious medical needs of an inmate in violation of the

Eighth Amendment where the inmate was receiving
treatment in excess of the minimum required. Both doctors
completed their own primary care investigation of the
inmate's skin and circulatory complaints. The inmate was
twice sent for a rheumatology consult and the doctors
ordered extensive lab work. The inmate was also seen by
a dermatologist and later by a lupus specialist. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

Angus R. Love, Jennifer J. Tobin, Pennsylvania
Institutional Law Project, Philadelphia, PA, Marybeth
Walsh, Pittsburgh, PA, for Plaintiff.

Randall J. Henzes, Office of Attorney General,
Philadelphia, PA, Alan S. Gold, Gold & Robins,
Jenkintown, PA, for Defendants.

**MEMORANDUM**

NORMA L. SHAPIRO, Senior District Judge.
    *1 Plaintiff, Orlando Baez, a prisoner incarcerated at
SCI-Greene, filed a civil rights action under 28 U.S.C. §
1983 alleging deliberate indifference to his medical needs
in violation of the Fourteenth and Eighth Amendments to
the United States Constitution. Baez claims that
defendants, various prison officials and doctors at
SCI-Greene and SCI-Graterford, failed to provide him
with necesssary treatment for lupus and rectal bleeding.
Baez moves for a preliminary injunction requiring
defendants to provide him with a dermatology consultation
to evaluate his symptoms of lupus and a gastroenterology
consultation to determine the reason for his rectal
bleeding. Baez' motion will be denied.
**I. FACTUAL BACKGROUND**

    Baez is a prisoner previously incarcerated at
SCI-Graterford and currently incarcerated at SCI-Greene.
Defendant Dr. Byunghak Jin, a general surgeon at
SCI-Greene, is employed by Prison Health Services. (Hr'g
Tr. 72-73, May 6, 2008). Defendant Dr. Stanley Falor, a
general practitioner employed by Prison Health Services,
has worked at SCI-Greene since January, 1994. (Hr'g Tr.
171-73, May 6, 2008.) Baez testified Dr. Falor took his
complaints seriously and treated him better than the other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1183910 (E.D.Pa.)

(Cite as: 2009 WL 1183910 (E.D.Pa.))

physicians. (Hr'g Tr. 67, May 6, 2008.) Dr. Falor has not been involved in Baez's care since August, 2006. (Hr'g Tr. 38, May 7, 2008.)

Baez alleges that since 2004, he has had constant pain in his stomach, chest, and heart. (Hr'g Tr. 33-34, 131, May 6, 2008.) Baez testified he submitted sick call slips to SCI-Greene staff, but they ignored him, laughed, or walked away. (Hr'g Tr. 32, May 6, 2008.) The pain medication provided to Baez was ineffective. (Hr'g Tr. 32, May 6, 2008.) Dr. Jin acknowledged Baez had complained about stomach and abdominal pain, and ineffectiveness of pain medication, since arriving at SCI-Greene. (Hr'g Tr. 134-35, May 6, 2008.)

**A. Lupus**

After evaluating Baez's symptoms, Dr. Falor referred Baez to Dr. David E. Seaman, a rheumatologist who specializes in lupus. (Pl.'s Ex. P-1-F; Hr'g Tr. 174-75, May 6, 2008.) Lupus is a chronic, inflammatory systemic disease that can affect different organs in the body. (Seaman Dep. 8.) There are two types of lupus: skin lupus, causing skin rashes, and systemic lupus, affecting the nervous, circulatory, lung and cardiovascular, and gastrointestinal systems. (Seaman Dep. 9-10.) Skin lupus can become systemic lupus. (Hr'g Tr. 89, May 6, 2008.) Systemic lupus can be fatal. (Hr'g Tr. 77, 170, May 6, 2008; Seaman Dep. 64.)

There is no single diagnostic test for lupus; diagnosis depends on evaluating a number of symptoms and test results. (Seaman Dep. 11-12.) Symptoms of lupus include: malar rash, discoid rash, photosensitivity, oral ulcers, arthritis, serositis, renal disorder, neurologic disorder, hematologic disorder, immunologic disorder, high anti-double strain DNA level, and high antinuclear antibody level. (Seaman Dep. 13; Pl.'s Ex. P-10.) Lupus has both latent and active stages, and symptoms can appear and recede. (Hr'g Tr. 78-79, 174, May 6, 2008.)

**\*2** Lupus has no cure, but treatment can slow progression of the disease. (Seaman Dep. 58.) Skin lupus is treated with topical creams and oral medication. (Seaman Dep. 73.)

Dr. Seaman saw Baez on June 29, 2006, and April 16, 2008. Dr. Seaman was not provided with Baez's medical

records prior to the June, 2006 examination, and did not speak with Dr. Falor or Dr. Jin prior to or after examining Baez. (Seaman Dep. 23.) Dr. Seaman observed excoriated, or "scabby," lesions on Baez's arms, back, trunk, and legs. (Seaman Dep. 33-34.) In his June 29, 2006, report, Dr. Seaman stated he doubted Baez had systematic lupus but wanted to rule it out; he planned the following:

(1) Will obtain CBC, CR, LFT, TSH, ANA, DNA, ENA, C3, C4-SSA/B, CR, U/A.

(2) X-ray C spine and LS spine.

(3) CT of the abdomen.

(4) Suggest referral to GI, cardiology and dermatology. This will be deferred to Dr. Falor.

(5) Follow-up in one month in the Waynesburg office.

(Pl.'s Ex. P-6.) The cervical lumbar x-rays and CT scan of the abdomen were performed. (Hr'g Tr. 30, May 7, 2008.) In a July 11, 2006, progress note, Dr. Jin deferred any dermatology, cardiology, or gastrointestinal consult. (Pl.'s Ex. P-1-Q.)

Baez was not returned to see Dr. Seaman one month after the first visit. (Seaman Dep. 39-40; Hr'g Tr. 149-50, May 6, 2008.) According to the file Dr. Seaman maintained for Baez, "Vicki" from SCI-Greene called Dr. Seaman to schedule a one month follow up visit on July 26, 2006. (Seaman Dep. 78.) The visit was rescheduled for September 6, 2006, because Dr. Seaman had ordered a "DES test" for Baez in August. (Seaman Dep. 78.) A note in Baez's file stated Vicki from SCI-Greene called to cancel the September 6, 2006, office visit because Baez refused a CT scan. (Seaman Dep. 78.) The note stated that if Baez decided to have the CT scan done, the visit would be rescheduled. (Seaman Dep. 78-79.) Baez signed a consent form for a CT scan on September 11, 2006; the CT scan was performed on November 8, 2006. (Hr'g Tr. 156, May 6, 2008.) Baez was not returned for a second visit with Dr. Seaman until one and a half years after the CT scan was performed. (Hr'g Tr. 158, May 6, 2008.)

Baez's second visit with Dr. Seaman was on April 16,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1183910 (E.D.Pa.)

(Cite as: 2009 WL 1183910 (E.D.Pa.))

2008. Dr. Seaman did not have an opportunity to review complete medical records before Baez's second visit. (Pl.'s Ex. P-6.) Dr. Seaman did not receive Baez's laboratory results until the second visit. (Seaman Dep. 37.) Baez complained of arthralgia, abdominal pain, and heart pains. (Seaman Dep. 44.) After examination, Dr. Seaman suspected Baez had subacute cutaneous lupus, or skin lupus. (Pl.'s Ex. P-6.) Dr. Seaman wanted Baez to see a dermatologist for further evaluation, because there are multiple forms of skin lupus. (Seaman Dep. 74.) At deposition, Dr. Seaman testified he could not state with any certainty that a delay in seeing a dermatologist would cause Baez injury in the future. (Seaman Dep. 75.)

**\*3** Baez's symptoms of a photosensitive skin rash, arthralgia, abnormal double strain DNA test results, high anti-nuclear antibody ("ANA") test results, and positive SS-A / SS-B test results are consistent with lupus. (Seaman Dep. 56-59.) Dr. Seaman testified that as of the medical examination on April, 2008, Baez did not have a malar (butterfly-shaped cheek) rash, which is another symptom of lupus. (Seaman Dep. 62.) Dr. Seaman has not received test results for the SS-A and SS-B antibodies, which might support a diagnosis of subacute cutaneous lupus or Sjogren's syndrome. (Seaman Dep. 67, 87-89.) Baez has had a recurring non-malar rash for approximately a year while at SCI-Greene, but has not been seen by a dermatologist at SCI-Greene. (Hr'g Tr. 146-47.) Dr. Seaman recommended that Baez see a dermatologist for his skin condition. (Pl.'s Ex. P-6.)

Dr. Seaman testified at his deposition that he had not determined whether Baez had lupus. (Seaman Dep. 56, 64.) After the April, 2008, medical examination, Dr. Seaman received x-rays of Baez; Dr. Seaman did not make any further diagnosis as a result. (Seaman Dep. 66.) Dr. Seaman had not yet received SS-A or SS-B antibody tests, to help him determine whether Baez has skin lupus or Sjogren's syndrome. (Seaman Dep. 67-68.) Dr. Seaman suggested a second rheumatology opinion. (Seaman Dep. 66.)

Dr. Jin, who does not specialize in lupus, became medical director at SCI-Greene on October 1, 2006. (Hr'g Tr. 74-77, May 6, 2008.) Dr. Jin did not know for certain whether Baez has lupus. (Hr'g Tr. 19-20, 109, May 6,

2008.) Lupus Erythematosis is listed on Baez's "problem list" dated March 22, 2006, and on Baez's progress notes of July 20, 2006. (Hr'g Tr. 99, 107, May 6, 2008.) "Systemic lupus" is noted on May 8, 2006. (Pl.'s Ex. P-1-D.) Duplicate testing for lupus on May 8, 2006, returned positive results; anti-double strain DNA and antinuclear antibody tests returned positive; lab reports from March 21, 2006, and May 8, 2006, were positive for double strain DNA; and a lab report from July 8, 2006, showed high antinuclear antibody, elevated ESR, and high anti-double strain DNA results. (Hr'g Tr. 100, 122-23, May 8, 2006; Pl.'s Ex. P-1-F.) Dr. Jin noted elevated anti-nuclear antibody and elevated ESR levels in 2008, (Pl.'s Ex. 7), but stated in an April 23, 2008, letter that "no clinical traits of lupus" were shown. Pl.'s Ex. P-7.

Dr. Jin first decided not to follow Dr. Seaman's recommendations to refer Baez to gastroenterology and dermatology specialists because he did not agree it was necessary. (Hr'g Tr. 164-65, May 6, 2008.) Dr. Jin concluded Baez did not have lupus because he did not see any symptoms during an April 8, 2008, examination. (Hr'g Tr. 55, May 7, 2008.) Baez testified he did not disrobe during examinations by Dr. Jin, and Dr. Jin has never seen Baez's skin, other than his face and head. (Hr'g Tr. 70-71, May 6, 2008.) Dr. Falor agreed with Dr. Jin's initial decision not to send Baez for a dermatology consult after reviewing Baez' medical chart and because of his familiarity with Dr. Jin. (Hr'g Tr. 25, 38, May 6, 2008.) As prison doctors, Dr. Falor and Dr. Jin have been instructed to take cost into consideration when evaluating whether to follow a consultant's recommendation. (Hr'g Tr. 175, May 6, 2008.)

**\*4** Dr. Jin later changed his mind and arranged a dermatology consult for Baez. Baez was seen by Dr. Stephen Schleicher, via teledermatology on August 18, 2008. Dr. Schleicher was not able to detect any rashes but noted that Baez was "belligerent and uncommunicative" during the exam; Baez reportedly said, "I will not communicate unless my lawyer is present." (Ex. PSupp-1.) Dr. Schleicher recommended an ANA test every quarter, as well as a lupus band test, but did not state definitively that Baez had systemic lupus or Sjogren's syndrome.

Dr. Jin sent Baez to a second dermatological consult

Slip Copy, 2009 WL 1183910 (E.D.Pa.)

(Cite as: 2009 WL 1183910 (E.D.Pa.))

off-site on December 8, 2008. The December 15, 2008 lab report analyzing these results to him, Dr. Seaman would not state conclusively that Baez had lupus or any other systemic autoimmune disorder. (Ex. PSupp-4.) However, on Dr. Seaman's recommendation, Dr. Jin arranged for Baez to be seen by a rheumatology specialist at the University of Pittsburgh's Lupus Center of Excellence.

On February 20, 2009, Baez was seen by Dr. Fotios Koumpouras at the University of Pittsburgh, who diagnosed him as having systemic lupus, and possibly secondary Sjogren's syndrome. Dr. Koumpouras recommended courses of medication and tests to treat Baez' lupus, as well as his secondary joint pain and dry mouth. Dr. Koumpouras also requested repeat follow-up visits with Baez every six months. (Ex. PSupp-5.)

**B. Rectal bleeding**

Baez complained of rectal pain while at SCI-Greene, but medical staff did not respond to his first sick call slip regarding rectal bleeding. (Hr'g Tr. 37, 136-37, May 6, 2008.) Baez's complaints of rectal bleeding have been documented in progress notes. (Hr'g Tr. 137-38, May 6, 2008.) On June 18, 2007, Baez tested positive for blood in the stool that cannot be detected by the naked eye. (Hr'g Tr. 138-139, May 6, 2008.) Blood in the stool can result from internal bleeding. (Hr'g Tr. 142, 178, May 6, 2008.) Dr. Falor testified the hemoccult test showed the extent of Baez's bleeding was not serious because the blood counts did not change appreciably. (Hr'g Tr. 179, May 6, 2008.) Dr. Jin conceded further investigation must be done to determine why Baez is experiencing rectal bleeding. (Hr'g Tr. 144-45, May 6, 2008.)

Baez also complained of rectal bleeding during his second visit with Dr. Seaman. (Seaman Dep. 52.) Dr. Seaman recommended that Baez see a gastroenterology specialist for the rectal bleeding. (Pl .'s Ex. P-6.) Dr. Seaman acknowledges rectal bleeding is unrelated to his specialty, and his recommendation for a gastrointestinal consult was not meant to aid in the diagnosis of lupus. (Seaman Dep. 69-70.)

On April 8, 2008, Dr. Jin conducted a rectal exam of Baez, but Baez testified he did not disrobe during the exam. (Hr'g Tr. 53, 70, May 6, 2008.) Baez has received no diagnosis or treatment of his rectal bleeding. (Hr'g Tr. 37, May 6, 2008.) Appropriate responses to rectal bleeding might include a colonoscopy and a gastrointestinal consult. (Hr'g Tr. 180-81, May 6, 2008.)

**II. PROCEDURAL HISTORY**

**\*5** Baez filed a *pro se* complaint against prison officials and doctors at SCI-Greene and SCIGraterford. The court granted Baez's motion for appointment of counsel, and placed the action in administrative suspense pending appointment of counsel. Prison officials from SCI-Greene filed a motion to transfer claims against them to the Western District of Pennsylvania. The court removed the action from administrative suspense and ordered a hearing on a rule to show cause why Baez's claims against all defendants associated with SCI-Greene should not be severed and transferred. Counsel was appointed for Baez and the court deferred decision on transfer of claims against SCI-Greene defendants to provide Baez an opportunity to file a counseled response. Medical doctor defendants from SCI-Greene, including Dr. Falor and Dr. Jin, joined in the motion to transfer claims to the Western District of Pennsylvania.

Defendants Felipe Arias, Koseriowski, Eakin, Cusick, Stefanic, Harmon Crup, and Frank Masino filed a motion to dismiss. Baez filed a motion for transfer to SCI-Graterford. The court denied the motion to transfer without prejudice and gave Baez leave to file a counseled amended complaint.

Baez filed a motion for new counsel, and counsel filed a petition to withdraw. The court granted counsel's petition to withdraw. Baez then filed a motion for a preliminary injunction. New counsel, Angus R. Love, Esq., was appointed to represent Baez. The court held a two day evidentiary hearing on Baez's motion for preliminary injunction. Baez, Dr. Jin, and Dr. Falor testified. After the evidentiary hearing, the parties took a deposition of Dr. Seaman and provided a transcript to the court. The parties submitted proposed findings of fact and conclusions of law on Baez's motion for preliminary injunction. The court heard oral argument on the motion for preliminary injunction.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1183910 (E.D.Pa.)

(Cite as: 2009 WL 1183910 (E.D.Pa.))

After the August, 2008 teledermatology consult with Dr. Schleicher, Baez requested that the court reopen the record for the injunction to admit both Dr. Schleicher's report and Baez' letter complaining about the consult. The court, granting Baez' petition on January 7, 2009, ordered the record opened for supplementary evidentiary submissions through March 6, 2009, to be followed by supplementary briefing by all parties on Baez' motion for injunctive relief.

### III. DISCUSSION

#### A. Motion to dismiss

Defendants Felipe Arias, Koseriowski, Eakin, Cusick, Stefanic, Harmon Crup, and Frank Masino filed a motion to dismiss Baez's claims against them. After these defendants filed the motion to dismiss, Baez filed a counseled amended complaint. The motion to dismiss will be denied as moot.

#### B. Motion for preliminary injunction

Baez filed a motion for a preliminary injunction to require defendants to provide him with a dermatology consult to evaluate his symptoms of lupus, and a gastroenterology consult to determine the reason for his rectal bleeding. A preliminary injunction is an extraordinary remedy to be granted only if the moving party demonstrates: (1) reasonable probability of success; and (2) irreparable harm if relief is not granted. *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989). The court should also take into account: (3) the possibility of harm to other interested persons; and (4) the public interest. *Id.* Preliminary injunctions are only appropriate to remedy irreparable harm which is immediate or imminent, not speculative. *Campbell Soup Co., v. ConAgra, Inc.,* 977 F.2d 86, 91 (3d Cir.1992).

**\*6** In the complaint underlying his motion for injunctive relief, Baez claims defendants were deliberately indifferent to his symptoms of lupus and rectal bleeding. Deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Denial of reasonable requests for medical

treatment by prison officials is deliberate indifference when it exposes the inmate to "undue suffering or the threat of tangible residual injury" *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987).

Deliberate indifference may be found if a prison official: has knowledge of the need for medical care yet intentionally refuses to provide it; delays necessary medical treatment for nonmedical reasons; prevents an inmate from receiving recommended treatment for serious medical needs; or denies access to a physician capable of evaluating the need for such treatment. *See ie.g., Monmouth County,* 834 F.2d at 346-47; *Durmer v. O'Carroll,* 991 F.2d 64, 67-68 (3d Cir.1993) (summary judgment denied where pre-incarceration doctor and neurologist recommended physical therapy for inmate, and reasonable trier of fact could find prison doctor deliberately avoided providing physical therapy). Continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm, may also amount to deliberate indifference. *White v. Napoleon,* 897 F.2d 103, 109 (3d Cir.1990).

A prisoner claiming deliberate indifference to his medical needs must demonstrate that those needs are serious. See *Monmouth County,* 834 F.2d at 346. A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the need for a doctor's attention. *Id.* at 347. In considering the seriousness of an inmate's medical need, the court may consider the effect of denying the particular treatment. *Id.* "[W]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Id.*

However, even if a prisoner's medical needs are serious, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer,* 991 F.2d at 67. A court will not attempt to second-guess the propriety or adequacy of a particular course of treatment if it remains a question of sound professional judgment. *Campbell v. Sacred Heart Hospital,* 496 F.Supp. 692, 694 (E.D.Pa.1980) (summary judgment in favor of defendants where, after four days of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1183910 (E.D.Pa.)

(Cite as: 2009 WL 1183910 (E.D.Pa.))

observation and examination in prison infirmary, plaintiff was released into general prison population without medication, treatment, or any agreement on whether he suffered from narcolepsy). Neither mere medical malpractice nor disagreement as to the proper medical treatment supports an Eighth Amendment claim. *Monmouth County,* 834 F.2d at 346. "Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim." *Norris v. Frame,* 585 F.2d 1183, 1186 (3d Cir.1978); *Roach v. Kligman,* 412 F.Supp. 521, 525 (E.D.Pa.1976). Whether additional diagnostic techniques or forms of treatment are required is a matter of medical judgment. *Estelle,* 429 U.S. at 107.

**\*7** Systemic lupus is chronic, progressively debilitating, and potentially fatal; known treatments may cure the condition, but they may be able to delay its progression. A lupus specialist has diagnosed Baez as having systemic lupus. Defendants would likely cause Baez lasting injury and undue suffering, violating his Eighth Amendment rights, were they to delay treatment needlessly, treat his lupus indifferently, or not treat him at all.

However, defendants are providing Baez with more than minimal treatment for his lupus. Both Dr. Falor and Dr. Jin have made their own primary care investigation of Baez' skin and circulatory complaints. Baez was sent twice to Dr. Seaman for a rheumatology consult, and Dr. Jin has ordered most of the lab work Dr. Seaman prescribed. On Dr. Seaman's recommendation, Dr. Jin arranged for Baez to be seen first by a dermatologist, Dr. Schleicher, and subsequently by a lupus specialist, Dr. Koumpouras of the University of Pittsburgh's Center for Lupus Excellence, who diagnosed Baez as having systemic lupus and possibly Sjogren's syndrome as well. Dr. Jin has stated that he will continue to treat Baez as Dr. Koumpouras recommends, and he will return Baez for a six-month follow-up appointment as Dr. Koumpouras requests.

Internal bleeding, which can be diagnosed through blood in stool, can signal a condition which could be life-threatening if untreated. Both Drs. Falor and Jin investigated Baez' complaints about rectal bleeding. In Dr. Jin's professional opinion, while Baez' present minor level

of rectal bleeding merits further investigation, the medical tests he and Dr. Falor ordered did not establish that a specialty consult with a gastroenterologist or a colonoscopy was required. Only Dr. Seaman, of all of the physicians who have treated Baez, have recommended that he be seen by a gastroenterologist.

Defendants' response to Baez' requests for medical treatment may have been deliberately indifferent because they were needlessly tardy or obstructive; that remains to be determined at trial. There may have been malpractice under state law. However, Baez is presently receiving treatment in excess of the minimum required by the Eighth Amendment.

Baez argues that injunctive relief is warranted because defendants have only raised the quality of the care they are providing in response to this litigation. According to Baez, if the court were to deny injunctive relief, defendants would be at liberty not to treat his conditions adequately. However, until defendants cease treating him adequately, Baez' concerns are speculative. The court may not enjoin defendants from violating Baez' Eighth Amendment rights when they are not violating them currently or threatening to do so.

Baez' request for a preliminary injunction is denied.

### ORDER

AND NOW, this 4th day of May, 2009, for the reasons set forth in the court's Memorandum of May 4th, 2009, it is **ORDERED** that plaintiff Orlando Baez' Motion for an Immediate Injunction (paper no. 61) is **DENIED.**
E.D.Pa.,2009.

Baez v. Department of Corrections
Slip Copy, 2009 WL 1183910 (E.D.Pa.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. Washington.
Chornor BROWN, Plaintiff,
v.
Chana WHITE, Peggy Palomarez, and Kathleen
Dowdy, Defendants.
No. CV-06-0196-MWL.

May 4, 2007.

Jeffry Keith Finer, Jeffry Finer Law Office, Spokane, WA,
for Plaintiff.

Mary C. McLachlan, Attorney General of Washington,
Spokane, WA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

MICHAEL W. LEAVITT, United States Magistrate
Judge.

*1 Before the Court is Defendants' motion for
summary judgment (Ct.Rec.38) which came on for
hearing, without oral argument, on April 26, 2007.
I. *Procedural History*

Plaintiff Chornor Brown ("Plaintiff") was formerly
incarcerated at Ahtanum View Correctional Complex
("AVCC"), but was transferred to Airway Heights
Corrections Center ("AHCC") on September 22, 2005.
(Ct.Rec.39). Plaintiff is represented by attorney Jeffry K.
Finer and is proceeding in forma pauperis in this civil
rights action pursuant to 42 U.S.C. § 1983.

Plaintiff claims Defendants violated his constitutional
rights under the Eighth Amendment by denying him
medical treatment. (Ct.Rec.9, p. 3). Plaintiff additionally
alleges his Fourteenth Amendment right to equal
protection was violated because his race was a factor in
the denial of medical treatment. (Ct.Rec.9, p. 3). Finally,
Plaintiff alleges that his due process rights and his rights

protected by the Washington State constitution were
violated. (Ct.Rec.9, p. 3).

On October 24, 2006, the parties consented to
proceed before a magistrate judge. (Ct.Rec.17). On March
5, 2007, Defendants filed a timely motion for summary
judgment. (Ct.Rec.38). Plaintiff filed a memorandum in
opposition to Defendants' motion for summary judgment,
as well as a statement of disputed facts, on April 16, 2007.
(Ct.Rec.47, 50). Defendants filed a reply to Plaintiff's
opposition on April 23, 2007. (Ct.Rec.52).

II. *Legal Standard*

Summary judgment is appropriate when it is
demonstrated that there exists no genuine issue as to any
material fact, and that the moving party is entitled to
judgment as a matter of law. Fed.R.Civ.P. 56(c). Under
summary judgment practice, the moving party

[A]lways bears the initial responsibility of informing the
district court of the basis for its motion, and identifying
those portions of "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any," which it believes demonstrate the
absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"[W]here the nonmoving party will bear the burden of
proof at trial on a dispositive issue, a summary judgment
motion may properly be made in reliance solely on the
'pleadings, depositions, answers to interrogatories, and
admissions on file.' " *Id.* Indeed, summary judgment
should be entered, after adequate time for discovery and
upon motion, against a party who fails to make a showing
sufficient to establish the existence of an element essential
to that party's case, and on which that party will bear the
burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322.
"[A] complete failure of proof concerning an essential
element of the nonmoving party's case necessarily renders
all other facts immaterial." *Id.* In such a circumstance,
summary judgment should be granted, "so long as
whatever is before the district court demonstrates that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

**\*2** If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).* In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *Fed.R.Civ.P. 56(e); Matsushita, 475 U.S. at 586 n. 11.* The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987),* and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.1987).*

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., 809 F.2d at 631.* Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita, 475 U .S. at 587* (quoting *Fed.R.Civ.P. 56(e)* advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. *Fed.R.Civ.P. 56(c).* The evidence of the opposing party is to be believed, *Anderson, 477 U.S. at 255,* and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita, 475 U.S. at 587* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)* (per curiam). Nevertheless, inferences are not drawn out

of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), aff'd, 810 F.2d 898, 902 (9th Cir.1987).*

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita, 475 U.S. at 587* (citation omitted).

III. *Discussion*

A. *Eighth Amendment Claim*

**\*3** Plaintiff's complaint alleges that he injured the fifth finger (pinky finger) on his right hand while playing basketball at AVCC in January of 2005. (Ct.Rec.9, p. 5). Plaintiff alleges that, after weeks of complaining, he was taken for x-rays on February 23, 2005. (Ct.Rec.9, p. 5). Plaintiff asserts that the x-rays revealed pain and swelling and a subchondral cyst in the head of the proximal phalanx of Plaintiff's finger. (Ct.Rec.9, p. 5). Plaintiff asserts that he continued to request medical treatment from medical staff at AVCC but such treatment did not occur until July 19, 2005. (Ct.Rec.9, p. 6). Plaintiff indicates that he was examined by John J. Hwang, M.D., on July 19, 2005 at Orthopedics Northwest in Yakima, Washington. (Ct.Rec.9, p. 6). Plaintiff indicates that Dr. Hwang diagnosed swelling at the PIJ, hyperextended DIJ, pain over the radial collateral ligament, pain over the central tendon, radial collateral ligament tear in the right fifth finger PIJ extension. (Ct.Rec.9, p. 6). Dr. Hwang recommended hand therapy at the Yakima Hand Clinic, to work on controlling the swelling and to possibly regain at least passive range of motion, and for Plaintiff to be fitted with static and dynamic splinting. (Ct.Rec.9, p. 6). Plaintiff was to return to Dr. Hwang in four weeks. (Ct.Rec.9, p. 6). Plaintiff alleges that upon his return to AVCC he was denied all further medical treatment for his injured pinky finger. (Ct.Rec .9, p. 7).

A prisoner's claim of inadequate medical care does

Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

not constitute cruel and unusual punishment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The "deliberate indifference" standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Second, the prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 837. A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." *Id.*

Deliberate indifference can be manifested by prison guards intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Estelle,* 429 U.S. at 104-05. However, where a prisoner alleges a delay in receiving medical treatment, the prisoner must allege that the delay led to further injury. *McGuckin v. Smith,* 974 F.2d 1050, 1060 (9th Cir.1992), *overruled on other grounds, WMX Techs, Inc. v. Miller,* 104 F.3d 1133, 1136 (9th Cir.1997); *Shapely v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir.1985).

A prison medical staff's acts or omissions will constitute deliberate indifference if staff members knew of and disregarded an excessive risk to an inmate's health. *Farmer,* 511 U.S. at 837. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they "interfere with treatment once prescribed." *Estelle,* 429 U.S. at 104-05. The Ninth Circuit has found deliberate indifference when prison officials "deliberately ignore the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner ." *Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir.1992) (reversing summary judgment where prison officials forced prisoner to endure a plane flight that resulted in ear injury, in direct contravention of a treating physician's previous orders); *Ortiz v. City of Imperial,* 884 F.2d 1312, 1314 (9th Cir.1989) (per curium) (reversing summary judgment where medical staff knew that pretrial detainee had head injury, but prescribed contraindicated medications,

disregarding evidence of complications to which they had been specifically alerted by private treating physician); *Tolbert v. Eyman,* 434 F.2d 625 (9th Cir.1970) (finding cognizable claim for deliberate indifference where warden refused to authorize prisoner's receipt of medicine that had been previously prescribed by a physician); *Cf. McGuckin v. Smith,* 974 F.2d 1050, 1062 (9th Cir.1992) (where surgery recommended by prisoner's prior physician was severely delayed, court was unable to hold doctors liable because prison administrators, not the doctors, were responsible for scheduling treatment).

**\*4** The Courts of other federal circuits have also found deliberate indifference where prison officials ignore a previous physician's treatment plan. *White v. Napoleon,* 897 F.2d 103 (3rd Cir.1990) (finding cognizable claim for deliberate indifference where prison officials ignored private hospital's treatment orders and refused inmate's access to prescribed medication); *Gill v. Mooney,* 824 F .2d 192 (2nd Cir.1987) (finding cognizable claim where prison officials refused to permit plaintiff to participate in exercise program prescribed by doctor); *Eades v. Thompson,* 823 F.2d 1055 (7th Cir.1987) (finding cognizable claim where prisoner alleged that prison officials made him travel and carry a heavy box, causing a surgical incision to gape open, in violation of prior medical orders); *Martinez v. Mancusi,* 443 F.2d 921 (2nd Cir.1970), *cert. denied* 401 U.S. 983, *cited with approval by Estelle v. Gamble,* 429 U.S. at 105 n. 10 (finding deliberate indifference where prison staff forced post-surgical prisoner-patient to walk, ignoring warnings from hospital personnel that inmate should not be moved); *see also* Carl T. Drechsler, Annotation, *Relief Under Federal Civil Rights Acts to State Prisoners Complaining of Denial of Medical Care,* 28 A.L.R. Fed. 279 (1976) (recognizing that, on the whole, courts do not condone the practice of prison officials ignoring orders rendered by a prisoner's previous physician).

The instant case is dissimilar to the above examples of Courts' finding deliberate indifference. Here, the record demonstrates that the defendants did not purposefully ignore or fail to respond to Plaintiff's medical needs arising from his injury. The evidence shows that Plaintiff received regular and continuous care for his medical complaints.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

On February 21, 2005, it was reported that Plaintiff had injured his right pinky finger while playing basketball approximately one and one-half weeks prior to the medical visit. (Ct.Rec.39-3, Att.A). He was seen at the medical department and diagnosed at that time with a jammed finger. (Ct.Rec.39-3, Att.A). X-rays were ordered to rule out a fracture or tendon disruption. (Ct.Rec.39-3, Att.A). X-rays were taken on February 23, 2007. (Ct.Rec.39-3, Att.B). Plaintiff was thereafter examined by Roy Gondo, M.D., on March 2, 2005. (Ct.Rec.39-3, Att.A). Dr. Gondo noted that the x-ray revealed no fracture or dislocation, the exam was unremarkable, and no orthopedic referral was necessary. (Ct.Rec.39-3, Att.A).

On May 19, 2005, Greg Bickel, PA-C, referred Plaintiff to Dr. Gondo for assessment. (Ct.Rec.39-3, Att. C). On May 25, 2005, Dr. Gondo examined Plaintiff, diagnosed a deviated right fifth digit, and recommended an orthopedic referral at that time. (Ct.Rec.39-3, Att. C). On June 30, 2005, Plaintiff's pertinent medical information was faxed to Orthopedics Northwest in preparation for the medical consult for Plaintiff. (Ct.Rec.39-3, Att.F).

On July 19, 2005, Plaintiff was seen by John J. Hwang, M.D., of Orthopedics Northwest. (Ct.Rec.39-3, Att.I). Dr. Hwang's medical report notes that Plaintiff initially jammed his right pinky finger rather severely in February and that he "continues to re-injure the finger." (Ct.Rec.39-3, Att.I). X-rays taken that day revealed "some subluxation at the PIJ consistent with a radial collateral ligament tear" but no obvious fracture. (Ct.Rec.39-3, Att.I). Dr. Hwang recommended hand therapy to control swelling and increase range of motion, and Plaintiff was given a referral to the Yakima Hand Clinic. (Ct.Rec.39-3, Att.J). Plaintiff was to return in four weeks "to discuss the possibility of a collateral ligament repair." (Ct.Rec.39-3, Att.I).

**\*5** AVCC did not have a contract with the Yakima Hand Clinic in 2005. (Ct.Rec.39-5, p. 3). On August 3, 2005, Plaintiff was informed that AVCC did not have orthopedic and rehabilitation services onsite and that Plaintiff would have to be transferred to AHCC for treatment as that facility offered physical therapy onsite. (Ct. Rec. 39-5, p. 2; Ct. Rec. 39-5, Att. C). On August 31,

2005, Plaintiff was again informed that if he wanted the recommended treatment, he could be moved to a facility where those services were available. (Ct.Rec.39-5, Att.F). On September 22, 2005, Plaintiff was transferred to AHCC for medical needs. (Ct.Rec.39-2, Att.A).

Plaintiff did not seek treatment for his pinky finger at AHCC until December 1, 2005. (Ct.Rec.39-3, Att.R). Plaintiff received hand therapy from December 1, 2005, through June 14, 2006. (Ct.Rec.39-3, Att.R, S, T). On June 14, 2006, Plaintiff was released from physical therapy with "full functional use of his right hand per [Plaintiff's] report." (Ct.Rec.39-3, Att.T).

The above undisputed evidence demonstrates that Defendants provided Plaintiff was continuous care for his medical complaints related to his finger. Accordingly, there does not appear to be a deprivation of medical care as alleged.

In any event, a prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment unless the mistreatment rises to the level of deliberate indifference to "serious medical needs." _Estelle,_ 429 U.S. at 106. The alleged deprivation must be, in objective terms, "sufficiently serious." _Farmer,_ 511 U .S. at 834. If Plaintiff's medical needs were not serious, then Defendants' conduct could not have arisen to a violation of the standard of conduct required by the Fourteenth Amendment.

As noted by Defendants, "serious medical needs" include "diseases such as asthma, hypertension, epilepsy, diabetes, tuberculosis and lupus" as well as impairments such as hearing loss, abdominal pains, fractures, kidney stones, lacerations, gunshot wounds, seizure disorders, chronic obstructive pulmonary disease, and cardiac problems. _Madrid v. Gomez,_ 889 F.Supp. 1146, 1200-1201 (N.D.Cal.1995); (Ct.Rec.40, p. 7).

The facts demonstrate that Plaintiff had an injured finger that, as revealed by a February 23, 2005 x-ray, was not fractured or dislocated. (Ct.Rec.39-3, Att.A). The facts further show that after that initial injury, Plaintiff continued to reinjure the finger. Plaintiff has acknowledged that his finger would jam when he put his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

hand into his pocket. (Ct.Rec.39-4). Plaintiff contends that he was not provided any means to immobilize his finger and protect against hyper-extension. However, the medical records do not reveal any recommendation for such action until July of 2005. The examination of Plaintiff following the February 2005 x-ray was "unremarkable," and the doctor performing the examination did not request or prescribe immobilization of Plaintiff's finger as it was not necessary at that time. (Ct.Rec.39-3, Att.A). An examination of Plaintiff's finger in July of 2005 revealed "some subluxation at the PIJ consistent with a radial collateral ligament tear" but no obvious fracture. (Ct.Rec.39-3, Att.I). A splint and physical therapy were recommended at that time. From the evidence submitted, it does not appear that the injury Plaintiff suffered, as alleged in his complaint, constitutes a "serious medical need" for the purposes of an Eighth Amendment medical claim. Plaintiff has failed to demonstrate that he had a "serious medical need" with respect to his injured finger or that Defendants disregarded Plaintiff's medical condition relating to his finger.

*6 Based on the foregoing, the Court finds that there is no genuine issue for trial with regard to an Eighth Amendment claim in this case. Therefore, the Court finds that Defendants have met their burden as the parties moving for summary judgment. Accordingly, Defendants' motion is granted with respect to Plaintiff's Eighth Amendment claim against Defendants.

B. *Equal Protection Claim*

Plaintiff's complaint alleges that a white inmate at AVCC was allowed treatment at the Yakima Hand Clinic while the AVCC staff denied Plaintiff, a black inmate, access to the same clinic. (Ct.Rec.9, p. 8).

Equal protection claims arise when a charge is made that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. *San Antonio School District v. Rodriguez,* 411 U.S. 1 (1972). In order to state a Section 1983 claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that defendants acted with intentional discrimination against plaintiff or against a class of inmates which included plaintiff. *Village of Willowbrook v. Olech,* 528 U.S. 562,

564 (2000) (equal protection claims may be brought by a "class of one"); *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir.2000); *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998); *Federal Deposit Ins. Corp. v. Henderson,* 940 F.2d 465, 471 (9th Cir.1991); *Lowe v. City of Monrovia,* 775 F.2d 998, 1010 (9th Cir.1985). "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren,* 152 F.3d at 1194.

Plaintiff contends that he was denied equal protection of the law because the staff at AVCC allowed a white prisoner access to a facility for treatment, while he was not allowed treatment at this same facility. (Ct.Rec.9, p. 8). To prevail on this claim, Plaintiff must prove that a discriminatory purpose was a motivating factor in Defendants' decision not to allow Plaintiff access to the Yakima Hand Clinic. *Abdullah v. Fard,* 974 F.Supp. 1112, 1119 (N .D.Ohio 1997); *Salaam v. Collins,* 830 F.Supp. 853, 859 (D.Md.1993).

While Plaintiff essentially argues that Defendants treated inmates differently based on race, Plaintiff's complaint fails to specifically allege that Defendants' actions were done with discriminatory intent. Plaintiff fails to provide any evidence that his race played a role in the Defendants' actions. Furthermore, as demonstrated by Defendants, the inmate transported from AVCC to the Yakima Hand Clinic in 2005 was transported in order to be fitted with a splint and not to receive physical therapy or other ongoing treatment. (Ct.Rec.39-5, Att.I). Dissimilar to the inmate transported to the Yakima Hand Clinic, Plaintiff required ongoing physical therapy sessions. Plaintiff received, and successfully completed, this physical therapy following his transfer to AHCC. (Ct .Rec.39-3, Att.R, S, T).

*7 Because Plaintiff has not specifically alleged discriminatory intent and Plaintiff has failed to establish that he was treated differently based on race, Plaintiff's allegations do not give rise to a claim for relief under section 1983 for violation of the Equal Protection Clause. The Court finds that there is no genuine issue for trial with regard to Plaintiff's equal protection claim, and Defendants have thus met their burden as the parties

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

moving for summary judgment. Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiff's equal protection claim against Defendants.

C. *Due Process*

Plaintiff contends that his due process rights were violated because he was threatened and discouraged from using the grievance system at AVCC. (Ct.Rec.9, p. 10).

The Due Process Clause protects prisoners from being deprived of liberty without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). The fact that Plaintiff complains that Defendant Dowdy used a hostile voice toward him and acted unprofessionally does not mean that his constitutional rights were violated. Verbal harassment and abuse and threats of bodily harm do not state a cause of action under 42 U.S.C. § 1983. *Freeman v. Arpaio,* 125 F.3d 732, 738 (9th Cir.1997); *Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987).

With respect to Plaintiff's grievance process, he was told to rewrite his grievances before filing them so that they would comply with DOC policy, Plaintiff re-wrote and filed his grievances, and Plaintiff has no complaint about the processing of those grievances. (Ct.Rec.39, p. 9). Plaintiff was not prevented from filing grievances, and he alleges no harm from the re-writing of his grievances. (Ct.Rec.39, p. 9).

Pursuant to Local Rule 56.1(d), the Court may assume that the facts as claimed by the moving party exist without controversy in the event that those facts are not controverted by the nonmoving party. LR 56.1(d). Here, Plaintiff provides no opposition argument or evidence in his response to dispute Defendants' motion for summary judgment with respect to the due process claim.

Based on the foregoing, it is apparent that there is no genuine issue for trial with regard to Plaintiff's due process claim. Defendants' motion for summary judgment with respect to Plaintiff's due process claim against Defendants is therefore granted.

D. *Section 1985 Claim*

Plaintiff makes a cursory claim that he is entitled to

relief pursuant to 42 U.S.C. § 1985. (Ct. Rec. 9, pp. 3 & 9).

Section 1985 proscribes conspiracies to interfere with an individual's civil rights. To state a cause of action under section 1985, Plaintiff must allege: (1) a conspiracy, (2) to deprive any person or class of persons of the equal protection of the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage or deprivation of any right or privilege of a citizen of the United States. *Gillispie v. Civiletti,* 629 F.2d 637, 641 (9th Cir.1980); *Giffin v. Breckenridge,* 403 U.S. 88, 102-03 (1971).

**\*8** The Ninth Circuit has held that a claim under § 1985 must allege specific facts to support the allegation that defendants conspired together. *Karim-Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 626 (9th Cir.1988). A mere allegation of conspiracy without factual specificity is insufficient to state a claim under 42 U.S.C. § 1985. *Id.; Sanchez v. City of Santa Anna,* 936 F.2d 1027, 1039 (9th Cir.1991).

Plaintiff has failed to plead with particularity with respect to his Section 1985 claim and additionally fails to offer a response to Defendants' motion for summary judgment on Plaintiff's Section 1985 claim. Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's Section 1985 claim against Defendants is granted. There is no genuine issue for trial with regard to Plaintiff's Section 1985 claim.

E. *State Law Claims*

Plaintiff alleges that Defendants violated his rights under not only the United States Constitution, but also the Washington State Constitution. (Ct.Rec.33). A court is not, however, required to undertake an independent state constitutional analysis without the plaintiff first raising a convincing argument. *State v. Gunwall,* 106 Wn.2d 54, 63 (1986). "Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable, and reasoned." *Id.* "If a party does not provide constitutional analysis based upon the facts set out in *Gunwall,* the court will not analyze the state constitutional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)

(Cite as: 2007 WL 1309544 (E.D.Wash.))

grounds in a case." *First Covenant Church of Seattle v. City of Seattle,* 120 Wn.2d 203, 224 (1992).

The six nonexclusive criteria established in *Gunwall* to determine whether the Washington State Constitution should be considered as extending broader rights to its citizens than does the United States Constitution are as follows: 1) the textual language of the state constitution; 2) significant differences in the texts of parallel provisions of the federal and state constitutions; 3) state constitutional and common law history; 4) preexisting state law; 5) differences in structure between federal and state constitutions; and 6) matters of particular state interest and local concern. *Gunwall,* 106 Wn.2d at 59-61.

Plaintiff has failed to consider or brief the *Gunwall* factors. In addition, Plaintiff has failed to plead with particularity his state constitutional claims. Plaintiff also offers no response to Defendants' motion for summary judgment on Plaintiff's state law claims. Based on the foregoing, the Court grants Defendants' summary judgment motion on Plaintiff's state law claim.

F. *New Claim*

A review of Plaintiff's complaint reveals no assertion of retaliation. (Ct.Rec.9). However, Plaintiff's opposition to Defendants' motion for summary judgment raises, for the first time, a claim that he was retaliated against by Defendants. (Ct.Rec.50, pp. 6-7); (Ct.Rec.52, pp. 4-5). It is not appropriate for Plaintiff to raise a new claim in an opposition to Defendants' motion for summary judgment. The retaliation assertion will not be considered by the Court.

**\*9** Due to the conclusions determined above, it is not necessary for the Court to address Defendants' arguments that they are entitled to qualified immunity from the suit. (Ct.Rec.38).

IV. *Conclusion*

For the reasons discussed above, this Court **GRANTS** Defendants' motion for summary judgment. (**Ct.Rec.38**). Plaintiff's complaint (Ct.Rec.9) is hereby dismissed with prejudice.

**It IS SO ORDERED.** The District Court Executive is directed to enter judgment in favor of Defendants Chana

White, Peggy Palomarez and Kathleen Dowdy and against Plaintiff Chornor Brown, file this Order, provide a copy to counsel for Plaintiff and Defendants, and **CLOSE** this file.

E.D.Wash.,2007.

Brown v. White
Not Reported in F.Supp.2d, 2007 WL 1309544 (E.D.Wash.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Andrew WILLIAMS, Plaintiff,
v.
J(A) SMITH (First Deputy Supt.), Dr. J. Perilli
(F.H.S.D.), Mrs. Capuano (Nurse Admin.), Mr.
Williams (Physician Assistant), T.G. Eagan (Grievance
Director), Sergeant Krusen, Sergeant MacNamara,
Correction Officer Clark, Correction Officer
Maldonado, Correction Officer Goffe, Defendants.
No. 02 Civ. 4558(DLC).

Aug. 10, 2009.
West KeySummary**Prisons 310**      **192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
**Sentencing and Punishment 350H**      **1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
    A prison doctor was not deliberately indifferent to a
prisoner's serious medical need in violation of the Eighth
Amendment when he determined that morning showers
were no longer necessary to treat the prisoner's back
condition. The prisoner argued that the doctor had denied
the request for continued daily showers because the
prisoner had filed grievances about the security staff not
allowing him to take the daily morning showers. However,
the prisoner failed to raise a question of material fact as to
whether the doctor acted with the necessary intent.

U.S.C.A. Const.Amend. 8.
Andrew Williams, Woodbourne, NY, pro se.

Thomas M. Biesty, State of New York, Office of the
Attorney General, New York, NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.
    **\*1** Andrew Williams ("Williams"), an inmate at Sing
Sing Correctional Facility ("Sing Sing"), has brought this
*pro se* civil rights action pursuant to 42 U.S.C. § 1983
against First Deputy Superintendent Joseph Smith
("Smith"), Facility Health Services Director John Perilli
("Perilli"), Nurse Administrator Kimberly Capuano
("Capuano"), Physician Assistant Phillip Williams
("P.A.Williams"), Grievance Director Thomas Eagan
("Eagan"), Sergeants John MacNamara ("MacNamara")
and Robert Krusen ("Krusen"), and Corrections Officers
John Clark ("Clark"), Enrique Maldonado ("Maldonado"),
and Melvin Goffe ("Goffe") (collectively, "Defendants")
[FN1] for their deliberate indifference to his serious medical
needs in violation of the Eighth Amendment, and for
retaliation in violation of the First Amendment. Williams
had an arthritic right knee and he injured his back in 1996.
He had back surgery in 1997. This lawsuit complains that
the defendants failed to accommodate these ailments
following that surgery, in particular by denying him access
to daily morning showers to relieve his back pain and
requiring him to climb stairs despite his knee condition.
Defendants have moved for summary judgment. For the
following reasons, summary judgment is granted in part.

    FN1. Williams also named Physical Therapist
    Mr. Abraham as a defendant in his Amended
    Complaint. The Court noted in its September 18,
    2003 Memorandum and Order that the plaintiff
    had provided no proof of service of Abraham.
    Plaintiff having failed to cure this defect, this
    Order and Opinion does not address Williams's
    allegations concerning Abraham.

Background

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Unless otherwise noted, the following facts are undisputed. While an inmate, Williams fell down a flight of stairs in 1996 and hurt his back, suffering multiple disc herniations. In December 1997, Williams underwent surgery for these injuries. After he returned to Sing Sing later that month, he continued to suffer from degenerative disc disease in his spine and a bulging disc and herniation in his back. In addition, he suffered from arthritis in his right knee.

Soon after Williams returned to Sing Sing following surgery, Sing Sing began referring him to outside specialists and physical therapists regularly, often multiple times per month. Between his 1997 surgery and the filing of this summary judgment motion, he had over 100 medical consultations. He was regularly given pain and anti-inflammatory medication, was provided with a back brace, and was issued medical passes that were supposed to allow him to be moved to the flats,[FN2] to take a daily shower, to use the elevator, to sleep on a firm bed, and to be served dinner in his cell on a "feed-up" tray. [FN3] Nonetheless, Williams experienced pain, tenderness, and decreased range of motion in his back and legs through his filing of this suit in 2002.

FN2. A flats pass allows an inmate to be housed on the first floor of a facility so as to avoid climbing stairs.

FN3. The pass allowing an inmate to have dinner delivered to his cell is called a feed-up pass.

*Daily Morning Shower*

Williams complained frequently about back pain that occasionally radiated to his shoulders, buttocks, and legs. He had difficulty "bending, twisting, standing or sitting for long duration ... [and] with certain movements and lifting heavy objects." Williams also complained about pain, stiffness, tightness, and spasms in his back, particularly in the morning. Outside specialists prescribed daily morning showers as heat treatment to alleviate these symptoms.

**\*2** Inmates at Sing Sing are generally entitled to shower three evenings per week. Beginning in 1999, Williams was issued a medical pass for a daily morning shower. Despite his possession of that pass, Williams asserts that on occasion certain defendants refused to

honor his right to a daily morning shower, and instead allowed him to shower only three evenings per week.

a. Goffe, Maldonado, MacNamara, Krusen and Smith

Williams presented a valid pass for his daily morning showers to officers Goffe and Maldonado for the first time on April 30, 1999.[FN4] Despite this pass, Goffe and Maldonado refused to permit a morning shower, asserting their understanding that administrative and safety considerations, as well as the housing block operating policy, did not allow inmates to take morning showers unless they were in keeplock (i.e., confined to their cells) or were inmate porters. Goffe and Maldonado consulted their superiors Krusen and MacNamara in making this determination. After this incident, officers repeatedly refused to honor his shower pass. In September 1999, Williams filed a grievance about the denial of his morning showers, which Smith asserts he rejected in reliance on "the medical department's conclusion that plaintiff did not need morning showers." He wrote on the denial that "although [Williams's] pass says AM showers, block policy dictates otherwise," and "staff can find no reason for AM shower."

FN4. Williams's medical record shows that an outside specialist first prescribed hot showers on April 23, 1999. Before that date, he was prescribed "moist heat" and heat packs.

b. Capuano and Eagan

When Williams's September 1999 grievance was denied, he appealed to the Central Office Review Committee ("CORC") in Albany. CORC asked Nurse Capuano for information regarding the underlying events. According to Capuano, she spoke with Dr. Perilli about Williams's case and then relayed to CORC that Williams did not need daily morning showers. Relying on evidence showing that Capuano spoke to Dr. Perilli on December 23, 1999, eight days after CORC had already denied Williams's grievance on December 15, and on evidence that Dr. Perilli did not withdraw the authorization for Williams to have a daily shower until the following year, Williams claims that Capuano never spoke to Dr. Perilli about this appeal, and instead changed Williams's treatment plan herself.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

As Director of the Inmate Grievance Program for the New York State Department of Correctional Services, Eagan was responsible for the administrative function of the inmate grievance program. Although was not a voting member of CORC, he signed the December 15, 1999 CORC decision. Williams claims that Eagan was aware of Capuano's alleged misrepresentation and did not intervene. Williams does not explain how Eagan learned of Capuano's alleged misrepresentation.

c. P.A. Williams

On July 31, 2000, an outside specialist wrote in Williams's medical chart "Daily shower x 3 mos (for lumbar pain)-AM." Williams claims that when P.A. Williams reviewed this instruction, he crossed out "AM" and wrote "not indicated, has daily shower written 6/27 x 3 mos." P.A. Williams does not remember reviewing this entry for "AM" showers, and neither admits nor denies that the handwritten annotation was his. He adds that if he altered the prescription for a pass, he did so because it called for a morning shower, and the medical pass form did not permit the designation of a time for showers. Although he authorized thousands of daily shower passes, as a general practice, he authorized passes for a certain time of day "extremely rarely" because "facility, security and administrative policies weighed against" doing so.

d. Dr. Perilli

**\*3** Dr. Perilli began serving as Facility Health Services Director in December 1999. Williams had a daily morning shower pass at that time and Dr. Perilli renewed it. On October 16, 2000, however, Dr. Perilli reviewed Williams's medical chart and wrote in it "*no* need for daily shower based on his medical diagnosis." At a November 16, 2000 consultation, Dr. Perilli refused to renew Williams's pass for daily morning showers. Dr. Perilli noted in Williams's medical file on that date, "discussion held about shower pass-[patient] has chronic back problem. I will recommend shower per block, but *not* daily showers."

Williams claims that Dr. Perilli denied his request for daily shower passes at the November 16 meeting for non-medical reasons. Williams says that he told Dr. Perilli at the meeting that he had filed grievances in September 1999 about the security staff not allowing him to take daily morning showers. In response, Dr. Perilli said "you file[d] grievance[s], oh I don't know about this," shook his head, and rescinded Williams's shower pass. Williams also claims that Dr. Perilli told him at this meeting that he would no longer issue daily morning shower passes because the security staff did not want to honor them, and the administration wanted Dr. Perilli to reduce the number of medical passes issued.

On November 20, Dr. Perilli wrote in Williams's medical file

I have reviewed ortho consultation 11-14-00 + recommendation for shower. Any outside consultant recommendations are always subject to provider review + DOC policies. As this is a chronic condition, there is no specific indicator for a daily shower (i.e., acute sprain, colostomies, etc.), but I will give shower per block [policy].

Subsequently, a number of outside specialists and physical therapists recommended daily morning showers, but Dr. Perilli repeatedly declined to issue Williams a pass for such showers, asserting it was not medically necessary.

e. Williams's Assertions of Pain Related to Deprivation of Daily Morning Showers

On November 11, 1999, Williams reported to a physical therapist that his back pain was an eight out of ten in intensity, and that this pain was relieved by hot showers. At a physical therapy appointment on April 5, 2000, he reported that showers relaxed his back, and at an appointment eight days later, the physical therapist noted that Williams's back was responding to heat and stretching. Williams asserts that he reported to an outside orthopedic specialist on November 14, 2000 that his back pain and spasms were reduced with heat treatment, but Williams's medical record does not reflect such a comment.

Williams's complaints about his back after Dr. Perilli terminated his shower pass on November 16, 2000 were similar to his complaints before. In both time periods, he complained about back spasms, back pain radiating to other parts of his body, and difficulty sitting. Williams does not make specific assertions, in either his medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

records or in his opposition to this motion, that his back pain increased after Dr. Perilli terminated his daily morning shower pass. On September 25, 2002, almost two years after Dr. Perilli initially denied Williams a daily morning shower pass, Williams reported his pain to be a persistent five to seven out of ten in intensity, a decrease from the eight he reported November 1999.

*Climbing Stairs*

**\*4** Williams had right knee surgery in 1996. Subsequently, he suffered from arthritis, stiffness, limited range of motion, and pain. As a result, doctors recommended that Williams limit his stair climbing.
a. Feed-Up and Flats Passes

Williams was issued feed-up and flats passes so he would not have to climb stairs regularly. He claims that he presented valid feed-up and flats passes on April 30, 1999 to officers Goffe and Maldonado. Williams claims Goffe and Maldonado said they would work on accomodating these passes. A month and a half later, Williams started receiving his feed-up tray. He does not claim defendants rejected his feed-up pass or directly interfered with it in any way. Goffe, Maldonado, and Krusen assert that they had no role in determining whether Williams should be served meals in his cell or in implementing such an accommodation; Krusen asserts that he did not even know about Williams's request.

Goffe, Maldonado, and Krusen claim they also had no role in the decision to move Williams to a new cell. Williams says Goffe and Maldonado intentionally delayed his move to the flats, never notified the appropriate authorities about his request, and told him the more he asked the longer he had to wait to be moved. Williams does not explain how Krusen delayed his move to the flats; he asserts only that Krusen told him that there was no room in the flats and that a gallery officer would inform him when there was room. Williams claims that other inmates were being moved to the flats ahead of him. He was moved to the flats in October 2000, eighteen months after first presenting his flats pass.

b. Fishkill Stairs

Sing Sing sent Williams to Fishkill Correctional

Facility ("Fishkill") for physical therapy from April 1999 through December 2000. Clark worked at Fishkill and escorted Williams to the clinic there a number of times. Williams claims that "on approximately 10 occasions" Clark refused to allow Williams to use the elevator, and, instead, made Williams walk up six flights of stairs to the treatment unit, despite the fact that he had an elevator pass at Sing Sing. Williams claims that on April 13, 2000, Clark told him the elevator was not working properly and was only to be used in emergencies; after he walked up the stairs, though, he saw other inmates using the elevator. Williams refused to attend therapy sessions at Fishkill in October, November, and December 2000. He was discharged from the Fishkill clinic in December because of his refusal to attend, and he was immediately sent to another facility for therapy where he did not need to walk up stairs.
c. Williams's Assertions of Pain Related to Climbing Stairs

Over the course of the period in question, Williams complained about knee pain at dozens of medical consultations. He had limited range of motion in his right knee, complained about it giving out occasionally and being painful on range of motion tests, and he was diagnosed with right knee effusion.[FN5]

FN5. Knee effusion is a condition where excess fluid accumulates in and around the knee joint.

**\*5** Doctors recommended that he limit his stair climbing. Williams does not make specific assertions about the quantity or quality of pain he experienced directly related to climbing stairs. He instead asserts generally that he had "perplexities" walking up stairs, and that he eventually refused to attend physical therapy at Fishkill because it was too painful to walk up six flights of stairs to the treatment unit.

Procedural History

Williams filed an amended complaint on November 12, 2002. Defendants moved to dismiss the suit on January 22, 2003. By a Memorandum and Order dated September 18, 2003, the Honorable Lawrence McKenna, to whom this case was then assigned, granted the motion to dismiss with respect to only one defendant, Superintendent Brian

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Fisher. Defendants filed a motion for summary judgment on May 15, 2007, which became fully submitted on March 5, 2009. On June 5, 2009, this case was reassigned from Judge McKenna to this Court.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Sista v. CDC Ixis N. Amer., Inc., 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e); accord Sista, 445 F.3d at 169. "It is well established that the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." Triestman v. Fed. Bur. of Prisons, 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation omitted).

This Opinion first addresses Williams's Eighth Amendment claim, discussing in turn: personal involvement, deliberate indifference, and qualified immunity. This Opinion then discusses Williams's First Amendment retaliation claim.

*Personal Involvement*

Defendants Smith and Eagan move for summary judgment on the ground that they were not personally involved in the alleged deprivation of Williams's rights. Section 1983 provides in part that

[e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall

be liable to the party injured.

**\*6** 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir.2003); see also Reynolds v. Giuliani, 506 F.3d 183, 190-191 (2d Cir.2007) (discussing municipal liability). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir.2006) (citation omitted); accord Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir.2009).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted); Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir.1999). Thus, a plaintiff may establish a supervisor's personal involvement by showing that the supervisor:

(1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

Iqbal v. Hasty, 490 F.3d 143, 152-153 (2d Cir.2007) (citation omitted).

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Defendants argue that Smith and Eagan are entitled to summary judgment as they were not personally involved in the alleged deprivation of Williams's rights. Williams has not asserted that either Eagan or Smith were directly involved in interfering with Williams's medical treatment. Williams instead argues that Eagan is liable because he was aware of Capuano's alleged misrepresentation and failed to intervene. Williams has failed, however, to explain how Eagan became aware of Capuano's alleged misrepresentation or how he was otherwise personally involved in the deprivation of his rights. Eagan is therefore entitled to summary judgment.

Williams argues that Smith was personally involved in depriving Williams of his rights by denying Williams's grievance. Under Second Circuit law, it is "questionable" whether Smith's denial of Williams's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004). *See also Rahman v. Fisher,* 607 F.Supp.2d 580, at 585 (S.D.N.Y.2009) (personal involvement may exist where supervisor fails to act on reports of violation and violation continues). It is not necessary to reach this issue, though, as Smith is entitled to summary judgment on Williams's deliberate indifference claim for other reasons, as discussed below.

*Deliberate Indifference*

**\*7** All of the defendants argue that Williams has failed to show that he suffered a serious lapse in care for his back and knee conditions and that the defendants were deliberately indifferent to his medical needs. Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Id.* (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that "the charged official must act with a sufficiently culpable state of mind." *Id.* at 280.

To determine whether the deprivation was sufficiently

serious, a court must first ascertain whether "the prisoner was actually deprived of adequate medical care," keeping in mind that "the prison official's duty is only to provide reasonable care." *Id.* at 279. An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

A court must consider whether any deprivation was itself "sufficiently serious." *Salahuddin,* 467 F.3d at 280. This inquiry requires an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious." *Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Id.* Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim. *Id.* "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

**\*8** "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (citation omitted). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 279 (citation omitted).

Second Circuit decisions have primarily discussed the serious medical need standard in the context of total failures to treat underlying medical conditions. *Smith,* 316 F.3d at 184 n. 8. In this context, courts in this district have determined that claims that fail to meet the constitutional standard of seriousness include: a "cut finger, even where skin is ripped off," *Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); a broken finger, *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999); and a foot condition involving a fracture, bone cyst and degenerative arthritis, *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999). Claims that have met the constitutional standard of seriousness include failures to treat, *inter alia:* a painful facial keloid scar, *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003); a dental cavity at risk of "acute infections, debilitating pain and tooth loss," *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); abscessed teeth causing "great pain" for six months and tooth degeneration, *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); ruptured Achilles tendon that resulted in swelling and pain, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-09 (2d Cir.1998) (per curiam); eye problems that resulted in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); and three-year extreme hip pain caused by embedded broken pins, *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994).

The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Compare Mendoza v. McGinnis,* No. 05 Civ. 1124 (TJM/DEP), 2008 WL 4239760, *10 (N.D.N.Y. Sept.11, 2008) (finding degenerative disc disease to constitute a serious medical need); *Guarneri v. Hazzard,* No. 06 Civ. 0985,

2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27, 2008) ("Severe back pain, especially if lasting an extended period of time, can amount to a serious medical need under the Eighth Amendment.") (citation omitted); *Faraday v. Lantz,* No. 03 Civ. 1520(SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica" leading to severe pain constitutes a serious medical need), *with Cain v. Jackson,* No. 05 Civ. 3914(LAP), 2007 WL 2193997, *6 (S.D.N.Y. July 27, 2007) (degenerative disc disease in cervical spine, which was compounded when plaintiff fell from her cell bunk and injured her back, was not sufficiently serious); *Jackson v. Fairchild,* No. 04 Civ. 73 (FJS/DRP), 2007 U.S. Dist. LEXIS 17497, *5, *9 (N.D.N.Y Mar. 12, 2007) (back pain did not constitute serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications."); *Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Davis v. Reilly,* 324 F.Supp.2d 361, 368 (E.D.N.Y.2004) (A "sprained back and neck ... do not constitute a serious medical condition.").

**\*9** To show that a defendant acted with a sufficiently culpable state of mind, "it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health," which "is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*

Prison medical staff is given wide discretion in determining how to treat inmates. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness." *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom,* 416 F.2d 449, 450 (2d Cir.1969) (Section 1983 "does not authorize federal courts to interfere in the ordinary medical practices ... of

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

state prisons."). As such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance,* 143 F.3d at 703. Moreover, a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference. *See, e.g., Revenell v. Van Der Steeg,* No. 05 Civ. 4042(WHP), 2007 U.S. Dist LEXIS 17868, *16-17, 2007 WL 765716 (S.D.N.Y. Mar. 14, 2007); *Sully-Martinez v. Glover,* No. 00 Civ. 5997(GEL), 2001 WL 1491278, *4 (S.D.N.Y. Nov.26, 2001).

Non-medical prison staff cannot, however, alter an inmate's treatment plan. "Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors." *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). "[A] deliberate indifference claim can [therefore] lie where prison officials deliberately ignore" such medical recommendations. *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005).

a. Shower Pass

Defendants argue that they are entitled to summary judgment because the denial of Williams's daily morning showers did not cause a serious enough injury to sustain an Eighth Amendment claim. Defendants point to the fact that Williams received extensive treatment for his back, including surgery, pain and anti-inflammatory drugs, a back brace, and regular physical therapy sessions, which Williams admits helped the very back condition for which the showers were prescribed. Dr. Perilli opines that denial of Williams's daily showers did not create a serious risk of harm. Williams does not show that he suffered greater back pain in the periods when he was denied daily morning showers than when he was permitted them. In fact, almost two years after Dr. Perilli refused to renew Williams's shower pass, Williams reported his back pain to be somewhat less intense than it was during a period when he was taking daily morning showers. Moreover, Williams has made no showing that the lack of showers affected his daily activities.

**\*10** Williams does, however, show contemporaneous reports by him and by his doctors that daily morning showers helped his painful back condition. In addition,

outside specialists repeatedly found Williams's back condition and his need for daily morning showers worthy of comment. Moreover, a failure to treat serious, chronic pain adequately when such treatment is available can constitute a sufficiently serious deprivation of medical care. *See Salahuddin,* 467 F.3d at 281 (applying presumption that five month failure to treat pain causes sufficiently serious harm). This is true even when other, substantial medical care is given for the underlying condition. Although the record suggests that Williams may have difficulty meeting the seriousness inquiry at trial, all inferences must be drawn in Williams's favor at the summary judgment stage, particularly because he is proceeding *pro se.* As such, although not every denial or even series of repeated denials of medical showers constitutes a serious medical injury, the record does not permit a finding as a matter of law that the deficiency in Williams's treatment was "minor and inconsequential," or that the deficiency did not create "a significant risk of serious harm." *Smith,* 316 F.3d at 187. Williams's papers must be read as showing that for approximately a year and a half, until Dr. Perilli revoked his medical pass for daily morning showers, the defendants denied him medically prescribed treatment for the chronic pain he experienced due to a back injury from which no one disputes that Williams suffered.

Defendants argue that they are entitled to summary judgment on the second prong of the deliberate indifference inquiry. Indeed, Smith and Dr. Perilli are. Smith asserts that he deferred to the medical staff's recommendation to deny Williams's grievance. Williams does not contest that Smith did so; and Williams offers no evidence that raises a question as to whether Smith actually took this course of action or whether this course of action reflected recklessness. Dr. Perilli shows that in his medical opinion he determined daily morning heat treatment was no longer necessary for Williams's condition. As discussed below, Williams attempts but fails to raise a question as to whether Dr. Perilli's decision was based on an ulterior motive rather than on medical judgment. Williams therefore has not raised a question of material fact as to whether Dr. Perilli acted with the intent necessary to satisfy the second prong of the deliberate indifference inquiry. Both Smith and Dr. Perilli are therefore entitled to summary judgment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

None of the remaining defendants identified as depriving Williams of a medically prescribed shower are entitled to full summary judgment on this prong. It is undisputed that Williams presented a valid medical pass for morning showers and that Goffe, Maldonado, Krusen and MacNamara did not honor that pass. Despite these defendants' claims that they were following facility protocol, a reasonable jury could conclude that their disregard of a medical pass constituted recklessness. P.A. Williams's assertion that if he changed Williams's prescription of morning showers he did so to comply with facility protocol is subject to the same analysis. As for Capuano, evidence suggesting that she changed Williams's treatment plan without consulting Dr. Perilli raises a question of material fact as to whether she acted not just recklessly but intentionally. None of these defendants is therefore entitled to full summary judgment on Williams's deliberate indifference claim related to shower passes.

**\*11** Goffe, Maldonado, Krusen, and MacNamara, are, however, entitled to partial summary judgment. After Dr. Perilli rescinded Williams's shower pass on November 16, 2000, these defendants were entitled to rely on Williams's lack of a valid medical pass to deny him daily morning showers. Williams has raised no question of material fact about whether these defendants acted recklessly in denying him daily morning showers after he no longer possessed a shower pass.

b. Climbing Stairs

Defendants are entitled to partial summary judgment on Williams's deliberate indifference claims related to climbing stairs. Dr. Perilli opines that climbing stairs at Fishkill when Clark refused to honor Williams's elevator pass and climbing stairs at Sing Sing when Williams's feed-up and flats passes were delayed did not create a serious medical risk of death, degeneration, or extreme pain. Although Williams has made only a limited showing about the pain climbing stairs caused him, he has asserted that climbing stairs did cause him pain, and outside specialists found the issue worthy of comment, and recommended that he avoid climbing stairs. Moreover, the pain of climbing stairs was apparently intense enough to cause Williams to choose not to attend physical therapy

sessions that required him to walk up stairs. Although a serious medical injury is not inflicted every time an inmate with a bad knee is required to climb stairs, in this case, with all inferences drawn in his favor, Williams has raised a question of material fact as to whether the pain caused by climbing stairs was serious enough to sustain an Eighth Amendment claim.

Goffe, Maldonado, and Krusen are entitled to summary judgment on Williams's deliberate indifference claim related to his feed-up pass. They claim that they were not responsible for accommodating Williams's feed-up pass, and Williams offers no evidence that they interfered with his pass being accommodated. Krusen is entitled to summary judgment for Williams's claim related to his flats pass, as well. Williams asserts that he had a conversation with Krusen about the delay in accommodating his pass, but he does not explain how Krusen was responsible for that delay. Goffe and Maldonado are not, however, entitled to summary judgment related to the flats pass claim. Despite their assertions that they had no responsibility for accommodating this pass, Williams's assertions that they threatened to delay his move, paired with the fact that his flats pass was not accommodated until eighteen months after his first conversation with Goffe and Maldonado, raise a question of material fact as to whether they did interfere with his move and thereby acted recklessly. Although an ordinary delay in moving an inmate to a new cell to accommodate his medical condition would not constitute a serious medical injury, Williams has alleged that these defendants intentionally delayed his move to the flats for a year and a half, while other inmates were getting moved there ahead of him.

**\*12** Clark is not entitled to summary judgment. There is no dispute that Clark knew that Williams had an elevator pass due to his knee condition. Although Clark asserts that he denied Williams access to an elevator because the Fishkill elevator had maintenance problems and was only to be used for emergencies, Williams's assertion that he saw inmates using the elevator has raised a question of material fact as to whether Clark acted intentionally or recklessly in denying Williams use of the elevator. While an occasional denial of access to an elevator would not rise to the level of serious injury to Williams's health, Williams has alleged that Clark

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

repeatedly, and without justification, refused over a period of months to allow Williams to use the elevator.

*Qualified Immunity*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the "appropriate question is the objective inquiry whether a reasonable officer could have believed that his actions were lawful in light of clearly established law and the information the officer possessed." *Kelsey v. County of Schohaire,* 567 F.3d 54, 61 (2d Cir.2009) (citation omitted). To assess a qualified immunity claim, a court must therefore consider:

(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted).

Williams has defined with sufficient specificity the Eighth Amendment right upon which his deliberate indifference claim rests; and the Supreme Court and Second Circuit have clearly established that right. As for the third prong, Goffe, Maldonado, Krusen, MacNamara, P.A. Williams and Capuano cannot avail themselves of qualified immunity as they are all alleged to have knowingly disregarded or altered Williams's medical passes or treatment plan, which was unlawful. *See Gill,* 824 F.2d at 196. Bald assertions by Goffe, Maldonado, Krusen, and MacNamara that they took their respective actions to comply with administrative and safety concerns do not provide an adequate ground for finding these actions objectively reasonable. These defendants have not explained the bases of their administrative and safety

concerns or how their actions addressed those concerns. It is therefore impossible at this point to determine as a matter of law that these defendants acted reasonably in choosing to serve those purposes rather than honor Williams's medical passes and treatment plans. If Capuano is liable to Williams, it is because she unilaterally changed his treatment plan. Although she contests the underlying allegation that she altered his plan, she offers no explanation of why a defendant who does, in fact, take such actions could reasonably believe she is acting lawfully. P.A. Williams offers a potential explanation for his actions, suggesting it was impossible for him to grant Williams's prescription for a morning shower pass because there was no place on the standard pass to indicate timing of showers. P.A. Williams's acknowledgment, however, that he has authorized medical passes for a certain time of day, albeit rarely, undercuts his explanation of why he override Williams's prescription in this case. He therefore offers an inadequate explanation of why a reasonable officer in his position would feel his actions were lawful.

*Retaliation*

**\*13** To prove a First Amendment retaliation claim, "a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (citation omitted). Exercising the right to petition for redress of a grievance is protected conduct. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 554 F.3d at 228. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Williams claims that after he filed a grievance in September 1999 about the security officers denying his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

morning shower pass, Dr. Perilli retaliated against him by
rescinding Williams's daily morning shower pass on
November 16, 2000. Williams argues that there was a
temporal connection between these two events, because
Dr. Perilli did not know about the grievances until
Williams told Dr. Perilli about them at the November 16
meeting. This argument fails. Dr. Perilli made a note one
month before the November 16 meeting concluding that
Williams had no medical reason for daily morning
showers. This prior note requires a finding that Dr. Perilli
had a proper reason to deny Williams a morning shower
pass even after Williams described his grievance filing to
Dr. Perilli. Williams has thus failed to raise a question of
material fact as to whether Dr. Perilli's allegedly
retaliatory action was causally related to Williams's filing
of grievances. Dr. Perilli is therefore entitled to summary
judgment on the retaliation claim.

CONCLUSION

    Defendants' May 15, 2007 motion for summary
judgment is granted in full as to Dr. Perilli, Eagan, and
Smith. Summary judgment is also granted as to Goffe,
Maldonado, Krusen, and MacNamara for Williams's
deliberate indifference claim related to his shower pass
after November 11, 2000; summary judgment is granted as
to Goffe, Maldonado, and Krusen for Williams's
deliberate indifference claim related to his feed-up pass;
and summary judgment is granted to Krusen for Williams's
deliberate indifference claim related to his flats pass.
Summary judgment is denied in all other respects as to
defendants Goffe, Maldonado, Krusen, MacNamara, P.A.
Williams, Capuano, and Clark.
    SO ORDERED.

S.D.N.Y.,2009.

Williams v. Smith
Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
**No. 99 Civ. 8646 DAB.**

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.FN1 For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams*, No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey*, No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at \*4.

> FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose.*"*Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

#### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see *also Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see *Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703; *see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

*5 A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Steven SMITH, Plaintiff,
v.
The PUBLIC ADMINISTRATOR OF SUFFOLK
COUNTY; Jean Leopold Edwin Renaud, M.D.; Eric
Davis, M.D.; Azeem Khawaja, M.D.; Rhodina
Williams, M.D.; Moses Tambe, M.D.; David Gregory
Ellis, M.D.; and Jennifer Mitchell, M.D., Defendants.
No. 06 CV 3740(CBA)(LB).

Aug. 31, 2009.

John Francis Lasalle, Scott Ronald Wilson, Stephen
Arthur Larson, Boies Schiller & Flexner LLP, New York,
NY, for Plaintiff.

Steven N. Schulman, Office of the Attorney General, New
York, NY, for Defendants.

**REPORT AND RECOMMENDATION**

BLOOM, United States Magistrate Judge.

   *1 Plaintiff, Steven Smith, brings this action pursuant
to 42 U.S.C. § 1983 alleging that defendants were
deliberately indifferent to his medical needs in violation of
the Eighth and Fourteenth Amendments to the United
States Constitution. Defendants, with two exceptions,
move for summary judgment. [FN1] The Honorable Carol B.
Amon referred this motion to me for a Report and
Recommendation in accordance with 28 U.S.C § 636(b).
For the following reasons, it is respectfully recommended
that defendants' motion should be granted in part and
denied in part.

> FN1. All defendants move for summary
> judgment, except for the Public Administrator of
> Suffolk County ("Public Administrator") and Dr.
> Ellis. The Public Administrator recently filed a
> notice of appearance on behalf of the estate of
> Dr. Francois Thebaud, who died on August 25,

2008. Document 124. Dr. David Gregory Ellis
was never served with process in this action. See
Pl. Memo at 7 n. 3. Therefore, plaintiff's
complaint against Dr. Ellis should be dismissed.
See Fed.R.Civ.P. 4(m) ("If a defendant is not
served within 120 days after the complaint is
filed, the court ... must dismiss the action without
prejudice against that defendant or order that
service be made within a specified time.").

**BACKGROUND**

   The following facts are undisputed unless otherwise
noted. [FN2]

> FN2. Rule 56.1 of the Local Civil Rules of the
> United States District Courts for the Southern
> and Eastern Districts of New York ("Local Rule
> 56.1") requires a party moving for summary
> judgment to submit "a separate, short and
> concise statement" of the allegedly undisputed
> material facts, set out in numbered paragraphs,
> on which the moving party relies in arguing that
> there is no genuine issue to be tried. See Local
> Rule 56.1(a); see also Gianullo v. City of New
> York, 322 F.3d 139, 140 (2d Cir.2003); Holtz v.
> Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d
> Cir.2001). Defendants have submitted statements
> of undisputed material facts, and plaintiff filed
> corresponding counter-statements under 56.1(b).
> The Court may not rely solely on the Rule 56.1
> statements: "[i]t must be satisfied that the citation
> to the evidence in the record supports the
> assertion." Vt. Teddy Bear Co., Inc. v. 1-800
> Beargram Co., 373 F.3d 241, 244 (2d Cir.2004);
> see Gianullo, 322 F.3d at 143 n. 5. Therefore,
> the Court relies only upon those facts in the
> parties' Rule 56.1 statements that are supported
> by admissible evidence and not controverted by
> the record.

**I. Factual History**

   At all relevant times, plaintiff was an inmate in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

custody of the New York State Department of Correctional Services ("DOCS"). Defs.' 56.1 ¶ 3. On or about October 14, 2003, plaintiff sought medical treatment at Cape Vincent Correctional Facility for recurring stomach pains. *Id.* ¶ 13. Plaintiff was diagnosed with gastroesophageal reflux disease ("GERD") and prescribed Zantac, peptic tabs, and Prevacid. *Id.* ¶¶ 16-23. On February 1, 2004, plaintiff was transferred to Arthur Kill Correctional Facility ("AKCF"). *Id.* ¶ 25.

On March 15, 2004, plaintiff saw Dr. Eric Davis at AKCF. *Id.* ¶ 28. Plaintiff complained about his stomach pain and stated that he was taking Prevacid twice a day. *Id.;* Pl. Dep. at 107. Dr. Davis requested a consult with a gastrointestinal specialist; the consultation request states: "43-year-old male with epigastric pain times four to six months despite negative H-pylori and Prevacid BID, needs upper endoscopy." Defs.' 56.1 ¶¶ 28-29.

Dr. Jennifer Mitchell, the AKCF Health Services Director, reviewed Dr. Davis' consultation request and referred the matter to plaintiff's primary care provider, Dr. Francois Thebaud, for follow-up. *Id.* ¶ 32; Pl.'s 56.1(b) ¶ 74. Dr. Mitchell states,

I believed that the request form did not contain all of the information needed for approval of the request, most importantly the results of blood and stool tests. I did not deny Dr. Davis' request, nor did I request the tests for my personal evaluation of the need for the consult, but because I believed that the request would not have been approved by the appropriate authorities with the information contained in the request. For that reason, I referred the matter to Dr. Thebaud, plaintiff's assigned primary care provider, to obtain the needed test results and follow up on the consultation request.

Mitchell Dec. ¶ 19. On March 22, 2004, Dr. Thebaud examined plaintiff and ordered abdominal X-rays and blood and stool tests. Defs.' 56.1 ¶¶ 33-36. The results of the blood test indicated that plaintiff was anemic. *Id.* ¶ 35.

Plaintiff saw Dr. Davis again on June 4, 2004. *Id.* ¶ 38. Dr. Davis recounts that plaintiff stated that he was feeling better and was no longer taking Prevacid, and therefore, Dr. Davis did not believe that an endoscopy was still necessary. *Id.* Plaintiff claims that he never told Dr.

Davis he was feeling better or that he was not taking Prevacid, and states that the Prevacid was involuntarily discontinued by DOCS staff. Pl.'s 56.1(b) ¶ 38.

**\*2** Over the next several months, plaintiff was given various medications for stomach pain. Defs.' 56.1 ¶¶ 40-43. On November 19, 2004, Dr. Thebaud saw plaintiff and prescribed Maalox Plus. *Id.* ¶ 43. Dr. Thebaud examined plaintiff again on January 14, 2005, but no complaints of stomach discomfort were reported. *Id.* ¶ 44.

On January 31, 2005, Dr. Mitchell co-authored a memorandum with Dr. Lang, the Regional Medical Director, recommending Dr. Thebaud's dismissal from DOCS. *Id.* ¶ 68. The memorandum states that Dr. Thebaud had been counseled on occasion for poor documentation of medical care and delay in providing follow-up care, and that he received increased supervision, including random patient chart reviews. *Id.* ¶ 66. Prior to being terminated, Dr. Thebaud resigned in April or May of 2005. Pl.'s 56.1(b) ¶ 87.

On April 11, 2005, plaintiff saw Dr. Jean Leopold Edwin Renaud. Defs.' 56.1 ¶ 46. Plaintiff testified that he told Dr. Renaud that he "was still having this awful pain in my stomach, that it wouldn't seem to go away. That the medication wasn't really helping ." Pl.'s 56.1(b) ¶ 88. Dr. Renaud recommended that plaintiff use pillows for elevation to help with his GERD. *Id.*

Plaintiff saw Dr. Davis for a third time on May 27, 2005. Defs.' 56.1 ¶ 50. Dr. Davis' note from that date read: "patient in follow-up of GERD, on Prevacid, Prevacid needs refill, wants extra mattress and pillow, then I wrote GERD, extra mattress denied, Prilosec 20 milligrams PO BID and I scheduled him it looks like to see me again on 6/24/05." *Id.*

Plaintiff saw Dr. Rhodina Williams on July 11, 2005. *Id.* ¶ 51. Plaintiff testified that at the time he was seen, he was still having stomach pains and that he was upset because he was denied pillows. Pl. Dep. at 129-30. Plaintiff claims that Dr. Williams refused to give him his scheduled physical examination because female doctors do not conduct physicals on male patients. *Id.* at 130. Defendants assert that "[p]laintiff was not scheduled to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

have a complete physical on Monday, July 11, 2005, because such examinations generally only occurred on the first Wednesday of the month." Defs.' 56.1 ¶ 51.

Plaintiff saw Dr. Moses Tambe on August 23, 2005. *Id.* ¶ 53. Defendants maintain that the purpose of the visit was for plaintiff to be evaluated for the repair of eyeglasses, and that Dr. Tambe had no reason to believe that plaintiff had any current complaints of gastrointestinal distress. *Id.* ¶¶ 53-54. However, plaintiff testified that he told Dr. Tambe about his stomach problems, and that Dr. Tambe examined his abdomen but refused to prescribe stronger medication. Pl.'s 56.1(b) ¶ 53; Pl. Dep. at 135-36.

Plaintiff states that on or about October 18, 2005, he saw Dr. Azeem Khawaja. Third Am. Compl. ¶ 29; Pl.'s 56.1(b) ¶ 94. Plaintiff claims that he complained to Dr. Khawaja and that he was advised to continue taking his medication. *Id.* Defendants contend that plaintiff never saw Dr. Khawaja. *See* Defs.' Reply at 9.

**\*3** On October 18, 2005, Dr. Felix Ezekwe examined plaintiff, and on October 24, 2005, plaintiff had his blood drawn. Pl.'s 56.1(b) ¶¶ 96-97. The blood test results indicated an abnormal blood count, and Dr. Ezekwe reported plaintiff as being severely anemic, possibly the result of internal bleeding, with a history of GERD and peptic ulcer disease. Defs.' 56.1 ¶ 59. Consequently, Dr. Ezekwe conducted an emergency telemedicine consult with Dr. David Gregory Ellis. Pl.'s 56.1(b) ¶ 98. Dr. Ellis recommended that plaintiff be seen by a gastrointestinal specialist, but instead, Dr. Ezekwe had plaintiff transferred to Staten Island University Hospital ("SIUH") on November 1, 2005. Defs.' 56.1 ¶ 60.

On November 4, 2005, a specialist at SIUH performed an endoscopy on plaintiff. Pl.'s 56.1(b) ¶ 98. Plaintiff was diagnosed with Stage IV metastasized malignant adenocarcinoma of the stomach. *Id* . Plaintiff had a gastrectomy to remove a six centimeter tumor, and was treated with radiation and chemotherapy. Defs.' 56.1 ¶ 62. He remained hospitalized at SIUH until November 18, 2005. Pl.'s 56.1(b) ¶ 98. When plaintiff returned to AKCF from the hospital, Dr. Mitchell was assigned as his primary care provider. Defs.' 56.1 ¶ 61.

## II. Procedural History

Plaintiff initiated this action *pro se* on July 28, 2006, alleging that defendants were deliberately indifferent to his medical needs by failing to properly diagnose and treat his cancer. Plaintiff also alleges that Drs. Thebaud and Mitchell failed to properly supervise the doctors at AKCF. On November 15, 2007, *pro bono* counsel appeared on plaintiff's behalf. Plaintiff, by counsel, filed an amended complaint, and thereafter, second and third amended complaints.[FN3]

> [FN3.] Plaintiff's third amended complaint, filed on December 2, 2008, adds Dr. Jennifer Mitchell as a defendant. Defendants, with the exception of Dr. Thebaud and Dr. Ellis, answered the third amended complaint on December 29, 2008.

On July 14, 2008, defendants' counsel informed the Court that because of a conflict of interest, Dr. Thebaud was being certified for representation by outside counsel pursuant to N.Y. Public Officers Law § 17 and that he had been instructed to find an attorney. Document 51. However, on August 25, 2008, before retaining outside counsel, Dr. Thebaud died.[FN4] By Order dated June 30, 2009, the Court granted plaintiff's motion to substitute the Public Administrator of Suffolk County for Dr. Thebaud's estate. The Public Administrator filed a Notice of Appearance on behalf of the estate on August 19, 2009. Defendants, except for the Public Administrator and Dr. Ellis, have moved for summary judgment. Plaintiff opposes the motion.

> [FN4.] On September 12, 2008, defendants' counsel filed a Suggestion of Death on the record pursuant to Fed.R.Civ.P. 25(a)(1).

## STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue of fact is 'genuine' if 'the evidence is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

such that a reasonable jury could return a verdict for the nonmoving party.' " *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (quoting *Anderson,* 477 U.S. at 248); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000); *see also Baker v. The Home Depot,* 445 F.3d 541, 543 (2d Cir.2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment). For the purposes of defendants' motion for summary judgment, the facts are viewed in the light most favorable to plaintiff.

**\*4** However, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e) (2); *see Matsushita,* 475 U.S. at 586-87. In other words, the non-moving party must provide "affirmative evidence" from which a jury can return a verdict in its favor. *Anderson,* 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagra Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Id.* (quoting *Anderson,* 477 U.S. at 252).

### DISCUSSION

### I. Deliberate Indifference to Medical Needs

Plaintiff alleges that defendants were deliberately indifferent to his medical needs in violation of his rights under the Eighth Amendment, as incorporated by the Fourteenth Amendment. The Eighth Amendment prohibits the infliction of "cruel and unusual punishment," U.S. CONST. amend VIII, which includes punishments that involve "the unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50

L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. In order to establish an Eighth Amendment violation for deliberate indifference to medical needs, a plaintiff must satisfy both an objective and subjective component. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

The objective component requires plaintiff to establish that he was subjected to conditions that are, in objective terms, "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The determination of whether a deprivation is objectively serious requires a two-step inquiry. "The first inquiry is whether the prisoner was actually deprived of adequate medical care ... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279-80 (2d Cir.2006). To meet the requirements of the subjective component, plaintiff must show that defendants knew of and disregarded an excessive risk to his health, were aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw that inference. *Chance,* 143 F.3d at 702 (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

### A. Objective Prong

**\*5** A genuine issue of material fact exists as to whether defendants provided plaintiff with adequate medical care. Plaintiff was seen by medical care providers at AKCF on numerous occasions between February 1, 2004 and November 1, 2005, for abdominal pain and his blood test in March 2004 showed that he was anemic. Drs. Davis, Renaud and Ezekwe all testified that a referral to a gastroenterologist is required when abdominal symptoms persist for more than two months despite medication. *See* Pl.'s Opp. at 10. Plaintiff's expert, Dr. Peter Kozuch, states:

physicians are trained to place the various symptoms of dyspepsia such as pain in the upper abdomen, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

sensation of fullness, bloating, excessive belching or heartburn in context with so-called alarm findings. These alarms include ... anemia ... Any one of these alarm systems help identify a potentially serious cause of abdominal discomfort such as stomach ulcer or stomach cancer ... Therefore, in Mr. Smith's case, the findings of so-called microcytic anemia and his persistent abdominal pain should have prompted referral, by each of the defendants who cared for Mr. Smith, for immediate upper endoscopy.

Kozuch Dec. ¶¶ 4-5. Here, plaintiff was diagnosed with GERD in October 2003 and a March 2004 blood test revealed he was anemic; however, he did not receive an endoscopy until November 2005, over a year and a half later. A reasonable jury could conclude that defendants' delay in providing an endoscopy denied plaintiff adequate medical care in violation of the Eighth Amendment.

To determine whether the inadequacy in medical care is sufficiently serious, the Court "examine[s] how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. If the "unreasonable medical care is a failure to provide any treatment," the Court's inquiry into the seriousness of a medical condition considers: "whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* (citing *Chance,* 143 F.3d at 702) (internal quotations omitted). "In cases where the inadequacy is in the medical treatment given," such as "an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin,* 467 F.3d at 280 (citing *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003)) (internal quotations omitted). Therefore, although defendants do not dispute that "gastric cancer, as a general proposition, is a serious illness," Defs.' Reply at 5, they urge the Court to consider the particular risk of harm faced by plaintiff because of the delay in treatment, and not plaintiff's underlying medical condition alone. *See Smith,* 316 F.3d at 186 (citing *Chance,* 143 F.3d at 702-03).

*6 However, plaintiff's testimony demonstrates that he suffered from chronic and substantial pain which establishes the seriousness of his medical condition. *See Hathaway,* 37 F.3d at 66 (a medical condition is considered objectively serious if it is a condition of urgency that may result in "death, degeneration or extreme pain") (citing *Nance v. Kelly,* 912 F.2d 605 (2d Cir.1990) (Pratt, J., dissenting)). Although defendants dispute that plaintiff continually complained of stomach pain at every medical appointment, plaintiff states that he experienced pain "[l]ike somebody was ripping out your umbilical cord. Like a stabbing pain," and that it was "continuous" and "wouldn't seem to go away." Pl. Dep. at 90, 109, 121. Moreover, the expert testimony leaves little doubt that plaintiff's medical condition was sufficiently serious. Dr. Kozuch states that "the two-year delay in obtaining requisite endoscopy resulted in his prolonged pain, progressive anemia ... and contributed to the increased risk for an advanced stage cancer diagnosis." Kozuch Dec. ¶ 10. Defendants' own expert, Dr. Santo DiFino, opines that "[i]f Mr. Smith were diagnosed in early 2004, it is possible that he could have had a lower stage [of cancer]." [FN5] Defs.' Ex. J. Given the record evidence herein, a reasonable jury could find that defendants' delay in providing plaintiff an endoscopy from March 2004 until November 2005 was unreasonable. Accordingly, plaintiff satisfies the objective component of his Eighth Amendment claim.

FN5. The expert testimony herein establishes that patients with Stage I cancer have a 60-80% five-year survival rate; patients with Stage II cancer have a 34% five-year survival rate; patients with Stage III cancer have a 8-20% five-year survival rate; and patients with Stage IV cancer have a 7% five-year survival rate. *See* Kozuch Dec. ¶ 11; Kozuch Reply Dec. ¶ 5; DiFino Dec. at 4.

**B. Subjective Prong**

To satisfy the second prong of his Eighth Amendment deliberate indifference claim, plaintiff must demonstrate that defendants acted with a "culpable state of mind." *Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

"This mental state requires that the charged official acted or failed to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280. This mental state is equivalent to subjective recklessness. *Farmer,* 511 U.S. at 836-37. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment Violation." *Chance,* 143 F.3d at 703. However, "a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.* (citing *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)).

**1. Dr. Tambe**

The record reflects that plaintiff saw Dr. Moses Tambe on only one occasion. Plaintiff alleges that he complained to Dr. Tambe on August 23, 2005 about his severe stomach pain, and that Dr. Tambe examined his abdominal area and reviewed his files but did not refer him for further tests or alter treatment. Third Am. Compl. ¶ 28; *see also* Pl. Dep. at 135-36. However, the record reflects that the purpose of plaintiff's appointment with Dr. Tambe was to address plaintiff's complaint of broken eyeglasses. *See* Defs.' Ex. C at 269. The nurse's note on August 18, 2005 and Dr. Tambe's note on August 23, 2005 only reflect plaintiff's desire to see an optometrist. *Id.* at 269-70. Dr. Tambe attests that "if plaintiff had significant complaints of gastrointestinal distress, I would have noted that in my note of August 23, 2005." Tambe Dec. ¶ 8. There is insufficient evidence from which a reasonable jury could conclude that Dr. Tambe acted with deliberate indifference to plaintiff's medical needs. Therefore, defendants' motion for summary judgment as to Dr. Tambe should be granted, and plaintiff's claims against Dr. Tambe should be dismissed.

**2. Dr. Khawaja**

**\*7** Plaintiff alleges that he appeared for a scheduled medical appointment with Dr. Khawaja on or about October 18, 2005, and that Dr. Khawaja failed to prescribe medication, conduct a physical examination, and review the tests in his chart. Third Am. Compl. ¶ 29. However, there is no record evidence that Dr. Khawaja ever saw plaintiff on October 18, 2005 or on any other date. Dr. Khawaja attests that he does not recall treating plaintiff,

that it is his practice to make an entry of any appointment on an inmate's health records, that none of the medical entries in plaintiff's medical records were made by him, and that the October 18, 2005 medical entry is not his note or in his handwriting. Khawaja Dec. ¶¶ 4-6. Even assuming that Dr. Khawaja was the doctor who treated plaintiff on or about October 18, 2005, according to the health records, the purpose of plaintiff's medical visit on that date was to address plaintiff's complaint of broken eyeglasses. *See* Defs.' Ex. C at 269. Moreover, even if Dr. Khawaja had seen plaintiff on that date and failed to prescribe medication, conduct a physical exam and review the tests in his chart, plaintiff fails to demonstrate that the delay in treatment caused by Dr. Khawaja subjected him to a serious risk of harm where plaintiff received an endoscopy less than three weeks later. Therefore, defendants' motion for summary judgment as to Dr. Khawaja should be granted, and plaintiff's claims against Dr. Khawaja should be dismissed.

**3. Drs. Davis, Renaud and Williams**

Relying on *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006), defendants argue that any failure to review plaintiff's medical record or to order an endoscopy is attributable to "simple blindness," not deliberate indifference.[FN6] Defs.' Memo at 11. They contend that "[t]here is no evidence that any of the defendants were aware of the blood test report of April 2004 showing anemia." Defs.' Reply at 6-7. They further argue that the blood test indicating anemia "was addressed to Dr. Thebaud and would not have been brought to the attention of Dr. Mitchell or any doctor other than Thebaud in the ordinary course of business." Defs.' 56.1 ¶ 35. Nonetheless, there is sufficient evidence for a reasonable jury to conclude that these defendants knew of and disregarded an excessive risk to plaintiff's health. *See Brock v. Wright,* 315 F.3d 158, 164 ("evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it.").

FN6. In *Salahuddin,* an inmate alleged that defendant's five-month delay in treating his Hepatitis C violated his rights under the Eighth Amendment. The Court found no constitutional violation and held that the doctor's belief, albeit incorrect, that Hepatitis C only leads to cirrhosis of the liver over the course of 20-30 years,

Page 7

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

precluded a finding of deliberate indifference. *Salahuddin,* 467 F.3d at 282. The Court found no circumstantial evidence to suggest "willful blindness," i.e. that the doctor knew of but disregarded a substantial risk that postponing treatment would cause plaintiff serious harm. *See id.*

Plaintiff received ongoing medical attention for over two years for complaints of abdominal pain and testified that he told Drs. Davis, Renaud and Williams that his pain persisted despite his medication. Pl. Dep. at 107, 121-30. Plaintiff's medical records, including the April 2004 blood test report, were easily available to defendants. *See* Ezekwe Dep. at 35. Defendants suggest that Drs. Davis, Renaud, and Williams were not obliged to review plaintiff's medical records. They cite to *Kennis v. Mercy Hosp. Medical Center,* 491 N.W.2d 161, 165 (Iowa Sup.Ct.1992), in which a state court in Iowa found that "[w]hether or not physicians have a duty to review a fifteen-year-old medical record on a patient to ascertain potential complications is not a matter that is so obvious as to be within the comprehension of a layperson." *See* Defs.' Memo at 15 n. 8. However, this Court is not persuaded by a nearly seventeen-year-old case from Iowa. Moreover, this Court finds that a reasonable jury could conclude that defendants' failure to review plaintiff's *recent* medical records, including the blood test results from March 2004 showing that plaintiff was anemic, constitutes deliberate indifference. According to Dr. Kozuch, "[a]s of 1-25-04 Mr. Smith's abdominal complaints displayed alarm signals that were readily apparent" and that "the finding of so-called microcytic anemia and his persistent abdominal pain should have prompted referral, by each of the defendants who cared for Mr. Smith, for immediate endoscopy." Kozuch Dec. ¶¶ 5, 10. Moreover, Dr. Davis and Dr. Renaud testified that even without an indication of anemia, a referral for an endoscopy is appropriate when abdominal symptoms persist for more than two months, despite medication. FN7 *See Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (denial of summary judgment is appropriate where there is "a substantial departure from accepted professional judgment and that the evidence of risk was sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to plaintiff.").

FN7. Dr. Davis testified, "if a patient has [epigastric] symptoms four to six weeks after I have started the patient on appropriate medication and they still have symptoms, then an endoscopy would be appropriate." Davis Dep. at 61. Dr. Renaud testified, "[u]sually I refer [a] patient after six to eight weeks of treatment, medical treatment, and I stop the medicine after that and I see how the patient problem, whether the patient problem is solve[d] or not. If the problem continue[s], then I refer to a gastroenterologist. Other situation I can have a patient who comes to me taking medicine and saying the medicine is not helping me and I refer." Renaud Dep. at 54.

**\*8** Defendants argue that plaintiff improperly focuses "on the overall care purportedly received ... without considering the situations facing each individual defendant," Defs.' Reply at 2, and that Drs. Davis, Renaud and Williams treated plaintiff on a "substitute" basis, and that the latter two treated plaintiff on a single occasion. Defendants also argue that plaintiff fails to address the "large gaps" in his medical history indicating his improvement. Defs.' Reply at 7. Nonetheless, it is defendants' burden, not plaintiff's, to demonstrate that they are entitled to judgment as a matter of law. Defendants' argument that these doctors treated plaintiff on a "substitute" basis does not alter the standards of care or the considerations for deliberate indifference. Thus, the fact that plaintiff was bounced between various "substitute" doctors, which was clearly not within his control, as opposed to receiving treatment from a single "non-substitute" doctor, does not relieve defendants of their constitutional obligation to provide adequate medical care.

In a last-ditch effort to sink plaintiff's case, defendants argue that "plaintiff's deposition testimony is demonstrably inaccurate or materially inconsistent with his other statements and cannot be used to create genuine issues of material fact." Defs.' Reply at 8. Defendants cite to *Denton v. Hernandez,* 504 U.S. 25, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992) to support their argument to discredit plaintiff's deposition testimony. The Supreme Court in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

*Denton* stated that "a court may dismiss a claim as factually frivolous only if the facts alleged are clearly baseless, a category encompassing allegations that are fanciful, fantastic, and delusional." *Denton*, 504 U.S. at 32-33 (internal citations and quotations omitted).

Defendants' use of *Denton* is off base and inappropriate. There is nothing fantastic or delusional about plaintiff's claims, and plaintiff's deposition testimony is neither factual nor replete with the level of contradictions and inconsistencies which would cast doubt upon its plausibility. *See Shabazz v. Pico,* 994 F.Supp. 460, 470-71 (S.D.N.Y.1998) (disposing of improbable allegations replete with inconsistent and contradictory statements); *see also Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). The record reflects that there are material issues of fact in dispute. There is sufficient record evidence from which a reasonable jury could conclude that the evidence of risk was sufficiently obvious to infer Drs. Davis, Renaud and Williams' actual knowledge of a substantial risk to plaintiff's serious medical needs. Accordingly, defendants' motion for summary judgment as to these doctors should be denied.

**4. Dr. Mitchell**

Plaintiff alleges that Dr. Mitchell was deliberately indifferent to his medical needs by not approving Dr. Davis' referral for an endoscopy in March 2004 and by failing to properly supervise defendants, particularly Dr. Thebaud. While there is no *respondeat superior* liability under 42 U.S.C. § 1983, a supervisor can be held liable "in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003).

*9 Plaintiff argues that Dr. Mitchell's decision to refer him to Dr. Thebaud for further tests was inconsistent with DOCS policy. Plaintiff states that "[t]he information contained on the face of Dr. Davis' referral request

demonstrated the medical appropriateness and necessity of referral of Mr. Smith to a gastrointestinal specialist for endoscopy," Pl.'s 56.1(b) ¶ 32, and cites to the DOCS "Clinician Orientation Manual," which states that "[s]pecialty referrals ... are approved or denied based on medical necessity criteria." Pl.Ex. 4 at 2069.

Nonetheless, the guidelines also provide that each referral request should include basic referral criteria,[FN8] and that "[i]f information is not sufficient to determine medical need, a referral can be 'pended' or routed back to the facility for additional information." *Id.* Dr. Mitchell attests that she referred plaintiff to Dr. Thebaud because she believed that "the request form did not contain all of the information needed for approval ... [and] would not have been approved by the appropriate authorities." Mitchell Dec. ¶ 19. While plaintiff disagrees with Dr. Mitchell's decision, "disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Therefore, Dr. Mitchell's decision to refer plaintiff for further tests does not constitute deliberate indifference.

FN8. Basic referral criteria includes: a clear description of the one problem to be evaluated; handwriting must be legible; current signs and symptoms; frequency-occurrences of episodes; duration of problems; a short and concise clinical summary for the initial evaluation or follow-up consult that meets medical necessity (including facility primary care treatment/interventions and patient's response, current medications); pertinent physical and laboratory findings; specific medical action/intervention being requested; specify surgical procedure requested and include (1) relevant history to justify surgery or procedure at time of request; (2) diagnosis of condition indicating surgery/procedure; (3) provide specific surgical procedure requested. The guidelines also require additional information for gastrointestinal conditions. Pl.Ex. 4 at 2070-72.

However, a material issue of fact exists as to whether

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

Dr. Mitchell directly participated in a constitutional violation, failed to remedy a wrong, was grossly negligent in supervising Dr. Thebaud, or failed to act on information indicating that unconstitutional acts were occurring. Dr. Mitchell attests that "Dr. Thebaud had been counseled on occasion for poor documentation of medical care and delay in providing follow up care," and "received increased supervision, including random patient chart reviews." Mitchell Dec. ¶ 50. She co-authored a January 31, 2005 memorandum detailing Dr. Thebaud's failures dating back to 2001 and 2002 and recommending Dr. Thebaud's termination "[d]ue to his failure to take appropriate clinical action ... and his pattern of poor judgment." Pl.Ex. 3.

Defendants argue that "[t]here is no evidence that Dr. Mitchell believed Thebaud required such micromanagement" in Spring of 2004, Defs.' Reply at 14, and Dr. Mitchell states that she "had no reason to believe in Spring 2004 that Dr. Thebaud would present a problem on follow up concerning any abnormal blood tests." Mitchell Dec. ¶ 54. However, "[a] reasonable jury could find that the significant risk that Dr. Thebaud would not provide adequate or appropriate follow-up care to Mr. Smith was already obvious and known to Dr. Mitchell by March 2004." Pl. Memo at 21. Dr. Mitchell wrote on Dr. Davis' referral form, "[follow-up with] Dr. T after tests ordered 3/22/04." Pl.Ex. 2 at 129. While Dr. Mitchell testified that this meant that Dr. Thebaud should follow-up with plaintiff, Mitchell Dep. at 228, this note could also mean that Dr. Mitchell noted she should follow-up on plaintiff's test results. Thus, a reasonable jury could find that Dr. Mitchell directly participated in the alleged constitutional violation or was grossly negligent in supervising Dr. Thebaud when she failed to "follow-up" with plaintiff after the tests missing from Dr. Davis' consultation request were performed.

**\*10** Dr. Mitchell's decision to refer Dr. Davis' consultation request to Dr. Thebaud rather than back to Dr. Davis is also troubling. Although defendants state that Dr. Mitchell sent plaintiff to Dr. Thebaud because he was plaintiff's primary care provider, plaintiff was a new inmate at AKCF and had never been seen by Dr. Thebaud. As the record reflects, plaintiff saw many different doctors at AKCF. It is unclear when plaintiff was assigned to Dr.

Thebaud or what significance attaches to defendants' pronouncement that Dr. Thebaud was plaintiff's primary care provider. In any event, Dr. Mitchell chose to send plaintiff to Dr. Thebaud instead of referring plaintiff back to Dr. Davis, the doctor who had already examined plaintiff and had requested an endoscopy for plaintiff.

Even assuming that Dr. Mitchell had "no reason to believe in Spring 2004 that Dr. Thebaud would present a problem," she came to believe that Dr. Thebaud should not be practicing medicine in late 2004. Mitchell Dec. ¶ 54. A reasonable jury could find that Dr. Mitchell was deliberately indifferent to plaintiff's medical needs by requiring him to be seen by Dr. Thebaud in November 2004 and again in January 2005, knowing that Dr. Davis had requested an endoscopy for plaintiff in March 2004 and that Dr. Thebaud had failed to take appropriate clinical action dating back to 2001. Therefore, defendants' motion for summary judgment as to Dr. Mitchell should be denied.

**II. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Here, there are material issues of fact in dispute regarding defendants' treatment of plaintiff's serious medical needs. Therefore, defendants' motion for summary judgment based on qualified immunity should be denied. *See Husain v. Springer,* 494 F.3d 108, 133 (2d Cir.2007) ("[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)); *see also Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain.").

**CONCLUSION**

Accordingly, defendants' motion for summary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2843281 (E.D.N.Y.)

(Cite as: 2009 WL 2843281 (E.D.N.Y.))

judgment should be granted in part and denied in part. Defendants' motion should be granted as to Drs. Tambe and Khawaja, and defendants' motion should be denied as to Drs. Davis, Renaud, Williams and Mitchell.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physician's Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**11** SO ORDERED.

E.D.N.Y.,2009.

Smith v. Public Admin. of Suffolk County
Slip Copy, 2009 WL 2843281 (E.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and
filed the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

*2 Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

[FN6.] Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. See April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. See March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. See generally Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. See County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

*6 [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383; *Ruggiero,* 467 F.3d at 174; *Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4)

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense."
*McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

***12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**FN1

> FN1. The following facts are taken from Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC FN2, followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⟜ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
        78k1395 Particular Causes of Action
            78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, FN1 a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,FN2 and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. _Blisset v. Casey,_ 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. _Scott v. Coughlin,_ 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).
>
> FN4. Plaintiff's wife application for _in forma pauperis_ relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, _i.e._, May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a _de novo_ determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a _de novo_ hearing on the matter. _United States v. Raddatz,_ 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. _Nelson v. Smith,_ 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting _Hernandez v. Estelle,_ 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. _Raddatz,_ 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> **FN5.** Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> **FN6.** In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996.) Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10 th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

*1 Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

**I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996***

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2039499 (W.D.N.Y.)

(Cite as: 2008 WL 2039499 (W.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Simon MENDEZ, Plaintiff,
v.
Registered Nurse BARLOW, D. Buyn, D. Kham, M.D.
and D. Nellist, R.N., Defendants.
No. 04-CV-1030S(F).

May 12, 2008.
Simon Mendez, Napanoch, NY, pro se.

Augello & Matteliano, LLP, Joseph A. Matteliano, of
Counsel, Buffalo, NY, for the Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.
**JURISDICTION**

*1 This case was referred to the undersigned for all
pretrial matters by the Hon. John T. Elfvin on June 13,
2006. It is now before the court on Defendants' motion to
amend the Second Amended Scheduling Order (Doc. No.
44) filed January 21, 2008, and Defendants' motion to
strike Plaintiff's opposition (Doc. No. 47) filed February
18, 2008.

**BACKGROUND**

In this civil rights action brought pursuant to 42
U.S.C. § 1983, Plaintiff alleges a violation of his rights
under the Eighth Amendment based on Defendants'
alleged failure to provide medical treatment for a serious
injury to his lower back following Plaintiff's fall in a
shower while Plaintiff was held in the Monroe County jail
where Defendants were employed as medical care staff.

By papers filed January 21, 2008, Defendants move
to amend (Doc. No. 44) ("Defendants' motion") the
Second Amended Scheduling Order filed May 24, 2007
(Doc. No. 38) including the Affidavit of Joseph A.
Matteliano, Esq. ("Matteliano Affidavit") and Defendants'

Memorandum of Law in Support of Motion to Amend
Scheduling Order ("Defendants' Memorandum").
Specifically, Defendants seek additional time to file a
motion for leave to file an amended answer raising as an
affirmative defense Plaintiff's failure to exhaust
administrative remedies. On February 12, 2008, Plaintiff
filed the Affidavit of Simon Mendez in opposition,
Plaintiff's Reply to Defendant's [*sic* ] Notice of Motion to
Amend Scheduling Order (Doc. No. 46) ("Plaintiff's
Reply" or "Mendez Affidavit"). On February 18, 2008,
Defendants moved to strike Plaintiff's Reply (Doc. No. 47)
("Defendants' Motion to Strike"). On February 28, 2008,
Plaintiff filed a letter in opposition to Defendants' Motion
to Strike (Doc. No. 48) ("Plaintiff's Reply/Response").
Oral argument was deemed unnecessary.

**FACTS**[FN1]

FN1. Taken from the pleadings and papers filed
in this action.

This action was commenced on December 27, 2004
against the Monroe County Hospital. Thereafter, Plaintiff
filed, on July 5, 2005, an amended complaint against
Defendants, a physician, registered nurses and a medical
staff member employed by the Monroe County Jail where
Plaintiff was being held in custody at the time he sustained
serious injury, following a fall in the jail's shower, to his
lower back. Plaintiff alleges Defendants failed to promptly
diagnose and treat this injury causing Plaintiff unnecessary
pain and suffering, and permanent injury. Because of
significant delay in effecting service upon the Defendants
by the United States Marshal's Service, Defendants
answered the Amended Complaint on March 24, 2006
("Answer") but did not assert, as an affirmative defense,
that Plaintiff failed to exhaust administrative remedies, in
the form of a grievance, as required under the Prison
Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) (" §
1997e(a)").

On August 22, 2006, a scheduling order was filed,
pursuant to Fed .R.Civ.P. 16(b), directing, *inter alia,* that
any motion to amend the pleadings be filed not later than

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2039499 (W.D.N.Y.)

(Cite as: 2008 WL 2039499 (W.D.N.Y.))

October 2, 2006 and that discovery conclude by June 1, 2007 (Doc. No. 17) ("the Scheduling Order"). On January 24, 2007, Defendants moved to amend the Scheduling Order to address difficulties in arranging for an independent medical examination of Plaintiff (Doc. No. 27), and, by order filed February 1, 2007, the Scheduling Order was amended, *inter alia,* to enlarge the period to June 29, 2007 conclusion of discovery ("Amended Scheduling Order") (Doc. No. 29). No change to the Scheduling Order's cut-off date, October 2, 2006, for motions to amend the pleadings was requested or included in the Amended Scheduling Order. On May 23, 2007, Defendants moved to amend the Amended Scheduling Order (Doc. No. 37) to accommodate the need to conduct an independent medical examination of Plaintiff. On May 24, 2007, a Second Amended Scheduling Order was filed amending the Amended Scheduling Order to enlarge the period to October 31, 2007 and September 28, 2007, respectively, for completion of discovery and expert disclosures ("Second Amended Scheduling Order") (Doc. No. 38). As with the Amended Scheduling Order, no additional period for motions to amend the pleadings was requested or included in the Second Amended Scheduling Order.

**\*2** As noted, on January 24, 2007, Defendants moved to dismiss the action, pursuant to Fed.R.Civ.P. 12(b)(6), based on Plaintiff's failure to allege exhaustion of administrative remedies as required by § 1997e(a). On December 12, 2007, the undersigned issued a Report and Recommendation recommending that Defendants' motion be denied (Doc. No. 42) ("the R & R"). Specifically, this court found that § 1997e(a)'s exhaustion requirement is an affirmative defense and that, unless pleaded as an affirmative defense to a prisoner civil rights action brought pursuant to § 1983, such defense is waived. R & R at 5 (citing *Jones v. Bock,* 549 U.S. 199,      , 127 S.Ct. 910, 921-22 (2007)). The court further found that as, in this case, Defendants never pleaded Plaintiff's failure to comply with § 1997e(a) as an affirmative defense in the Answer, Defendants had waived such defense, and that, based on such waiver, Defendants' motion to dismiss on this sole ground for relief was without merit and should be denied. *Id.* Defendants timely filed, on December 27, 2007, objections to the R & R (Doc. No. 43). On March 26, 2008, District Judge Skretny accepted the R & R (Doc.

No. 49) ("Order"), and denied Defendants' motion on the ground that under *Bock, supra,* Defendants had waived the affirmative defense otherwise available under § 1997e(a) by failing to plead it. Order at 4.

## DISCUSSION

Where the court has entered a scheduling order pursuant to Fed.R.Civ.P. 16(b) ("Rule 16(b)") providing a cut-off date for motions seeking leave to serve amended pleadings, the liberal standard of Fed.R.Civ.P. 15(a)(2) that such leave should be freely granted in the interest of justice does not apply. *Kassner v. 2nd Avenue Delicatessen, Inc.,* 496 F.3d 229, 244-45 (2d Cir.2000). Instead, the moving party must first meet the more stringent requirement, set forth by Rule 16(b), that a party seeking leave to amend the pleadings beyond the date established for filing such motions to amend must demonstrate the existence of "good cause," Fed.R.Civ.P. 16(b), for such a belated request to amend. *See Kassner,* 496 F.3d at 243; *Parker v. Columbia Pictures Industries,* 204 F.3d 326, 339-40). Under Rule 16(b), a finding of good cause "depends on the diligence of the moving party." *Parker,* 204 F.3d at 340. " 'Good cause' means that scheduling deadlines cannot be met despite a party's diligence." *Carnrite v. Granada Hospital Group, Inc.,* 175 F.R.D. 439, 446 (W.D.N.Y.1997) (citing 6A Wright, Miller, Kane, FEDERAL PRACTICE AND PROCEDURE, § 1522.1 at 231 (2d ed.1999)). Specifically, "[f]or purposes of Rule 16, a showing of 'good cause' requires 'the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.' " *Carnrite, supra* (citing and quoting cases). Although the absence of prejudice to the non-moving party is relevant to the exercise of the court's discretion, it does not satisfy the good cause requirement. *Id.* (citing *Amcast Indus. Corp. v. Detrex Corp.,* 132 F.R.D. 213, 218 (N.D.Ind.1990)). *See also Kassner,* 496 F.3d at 244 ("the primary consideration is whether the moving party can demonstrate diligence.") (citing *Parker,* 204 F.3d at 339-40).

**\*3** In support of the instant motion, Defendants argue that when Defendants filed, on January 24, 2007, their motion to dismiss asserting Plaintiff's failure to comply with § 1997e(a), "the law did not require pleading the affirmative defense of exhaustion of administrative

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2039499 (W.D.N.Y.)

(Cite as: 2008 WL 2039499 (W.D.N.Y.))

remedies in the Answer." Defendants' Memorandum at 4. Thus, according to Defendants, the Supreme Court's decision in *Bock, supra,* constituted "a significant change in the law" applicable to this case and, as such, constitutes "good cause" for purposes of Rule 16(b)'s requirement. *Id.* at 3 (citing *Oxaal v.. Internet Pictures Corp.,* 2002 WL 485704 *1-2 (Mar. 27, 2002 N.D.N .Y.).* Defendants' contention fails because contrary to Defendants' assertion, the applicable law did not change.

Prior to January 24, 2007, when Defendants' motion to dismiss was filed, the Second Circuit had, beginning in 1999, ruled in several published decisions that the exhaustion requirement of § 1997e(a) constituted an affirmative defense in a prisoner civil rights case. Specifically, in *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004) the court noted that in *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) the court found the § 1997e(a) exhaustion requirement was an affirmative defense. *Jenkins, supra* ("A defendant in a prisoner § 1983 suit must [ ] assert as an affirmative defense the plaintiff's failure to comply with the PLRA's [exhaustion] requirements."). In *Johnson,* the court also noted that in a 2002 decision, *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002), it had directed district courts to consider whether a defendant's failure to plead the affirmative defense waived it. *Johnson,* 380 F.3d at 695. Thus, in *Johnson,* in 2004, the Second Circuit specifically held this affirmative defense was subject to waiver by virtue of a defendant's failure to timely raise it. *Id.* In finding defendants in that case had waived the affirmative defense by failing to timely raise it, the court pointed out the absence of any basis on which defendants could have been "misled by the then-current *law of this circuit* into waiving its affirmative defense of non-exhaustion." *Johnson,* 380 F.3d at 696 (underlining added). No authority need be cited for the proposition that attorneys representing parties in this court (or any other court) are expected to familiarize themselves with the law applicable to matters for which they are responsible, and that relevant decisions of the Second Circuit are controlling precedent on matters before this court. While it is correct, as Defendants state, Defendants' Memorandum at 4, that other courts, including at least one circuit court of appeals, the Sixth Circuit, *see Knuckles El v. Toombs,* 215 F.3d 640, 642 (6th Cir.2000), had held § 1997e(a) to be an element of a

prisoner's civil rights actions, and not an affirmative defense, *Bock, supra,* 127 S.Ct. at 919-20, notably Defendants do not aver they relied upon such holdings in preparing their answer.

**\*4** Defendants also imply that Plaintiff's admitted failure to plead compliance with § 1997e(a), should excuse Defendants' failure to comport with the prevailing Second Circuit caselaw and the Supreme Court's ruling in *Bock, supra,* on this issue. Defendants' Memorandum at 4-5 (citing to Plaintiff's Reply in Further Opposition to Defendant's [*sic* ] Reply and Motion to Dismiss ¶ 19 (Doc. No. 33)). To suggest, that a *pro se* prisoner's lack of legal acuteness should excuse counsel's pleading oversight so as to avoid a waiver of the affirmative defense is disingenuous. Defendants' contention overlooks the Second Circuit's 1999 decision, *Snider v. Melindez,* 199 F.3d 108, 112 (2d Cir.1999), specifically holding that exhaustion need not be pleaded in a prisoner civil rights complaint. Simply, on this record, there is no basis to find that the *Bock* decision represented a significant change in the law relevant to Defendants' motion to dismiss, or that Defendants were unfairly misled by either the state of such law in this circuit or a *pro se* prisoner's lack of legal knowledge in filing the action. While courts have, as Defendants maintain, Defendants' Memorandum at 3, held that significant legal developments, arising after a Rule 16(b) scheduling order deadline for motions to amend, may constitute good cause, *Oxall, supra* at *1 (citing cases), the existence of several controlling Second Circuit precedents, decided well before Defendants filed their answer, requiring defendants in prisoner civil rights cases to timely plead the exhaustion of remedies affirmative defense or lose the defense by waiver, *Johnson,* 380 F.3d at 695, demonstrates unambiguously that no such significant change in law on that issue occurred in this case after the Scheduling Order was filed.

Finally, Defendants attempt to excuse their failure to plead § 1997e(a)'s requirements as an affirmative defense arguing that when Defendants' motion to dismiss raising the exhaustion defense was filed, a prisoner's complaint that failed to plead exhaustion of remedies was subject to dismissal by motion pursuant to Fed.R.Civ.P. 12(b)(6). Defendants' Memorandum at 4 (quoting *McCoy v. Goord,* 255 F.Supp.2d 233, 249 (S.D.N.Y.2003)). Defendants'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2039499 (W.D.N.Y.)

(Cite as: 2008 WL 2039499 (W.D.N.Y.))

reliance on *McCoy, supra,* in support of Defendants' contention is unavailing. In *McCoy,* the plaintiff's failure to exhaust was timely raised by defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") shortly after the action was commenced. *McCoy,* 255 F.Supp.2d at 240. Whether defendants filed an answer or instead filed a Rule 12(b)(6) motion in lieu of answer is not stated in the court's decision. *See Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 191-92 (2d Cir.2006) (affirmative defense properly raised on promptly filed Rule 12(b)(6) motion in lieu of answer). Here, Defendants' answer was filed March 24, 2006, (Doc. No. 9), and did not include § 1997e(a)'s exhaustion requirement as an affirmative defense; as noted, Defendants' motion to dismiss was not filed until January 2007. Moreover, the court in *McCoy* specifically noted that under prevailing Second Circuit law at that time, the defense of a prisoner's non-exhaustion of administrative remedies under the PLRA need not be pleaded in a complaint and that it was a waivable affirmative defense. *McCoy,* 255 F.Supp.2d at 247 (citing cases including *Snider* and *Jenkins, supra* ). Thus, *McCoy* affords no support for finding that Defendants were surprised by a "significant change in the law," and that when Defendants filed their motion to dismiss "the law did not require pleading the affirmative defense of exhaustion of administrative remedies in the Answer." Defendants' Memorandum at 4. As discussed, Discussion, *supra,* at 8, the Scheduling Order for this case was filed August 22, 2006, two weeks after the Second Circuit's decision in *Johnson, supra.* To the contrary, consistent Second Circuit caselaw so stated, since at least 1999, and two days prior to the filing of Defendants' motion, the Supreme Court confirmed such holdings in *Bock.*

**\*5** Defendants' reliance on a quotation from the *McCoy* decision in support of the instant motion, Defendants' Memorandum 4, does not support Defendants' position. In *McCoy,* the court stated, as Defendants quote: "If failure to exhaust is apparent from the face of the complaint, however, a Rule 12(b)(6) motion is the proper vehicle." Defendant's Memorandum at 4 (quoting *McCoy,* 255 F.Supp.2d 233, 249). However, in *McCoy,* the court also stated: "An affirmative defense *may be raised by a pre-answer* motion to dismiss under Rule 12(b)(6), without resort to summary judgment, if the defense

appears on the face of the complaint." *Id.* (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74-75 (2d Cir.1998) (statute of limitations defense appearing on face of complaint may be reached on motion to dismiss)). Thus, timely assertion of the exhaustion affirmative defense either in the answer or by a prompt Rule 12(b)(6) motion in lieu of answer, *Field Day, LLC, supra,* 463 F.3d at 191-92, preserves the defense for judicial determination; otherwise, as in this case, consistent with the relevant Second Circuit precedent, it is an affirmative defense that must be pleaded either by answer or a timely pre-answer to dismiss. As such, *McCoy's* holding that a defendant's Rule 12(b)(6) motion, may request dismissal on the ground that the prisoner civil rights complaint fails to allege exhaustion, affords no support for Defendants' position that the issue could be adjudicated on Defendants' motion to dismiss filed after Defendants' failure to plead it or timely move to dismiss in lieu of an answer. Here, as noted, Facts, *supra,* at 3, Defendants' answer was filed on March 24, 2006, and their Rule 12(b)(6) motion was filed about 10 months later on January 24, 2007. As Chief Justice Roberts explained in *Bock,* "[i]f the allegations, for example, show that relief is barred by the applicable statue of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense, *see* Fed. Rule Civ. Proc. 8(c)." *Bock,* 127 S.Ct. at 920-21. To find that Defendants have established good cause to permit a belated assertion of defense under § 1997e(a) would be tantamount to holding that despite the substantial progress of this case, including discovery, since the filing of the Amended Complaint in 2005, Defendants did not waive the affirmative defense. Likewise, that Defendants could have, but failed to, interpose the § 1997e(a) defense by way of a prompt Rule 12(b)(6) motion in lieu of answer, does not thereby render the defense anything other than an affirmative defense subject to waiver. *Id.*

As discussed, just as the record reveals no grounds to find good cause to permit a belated amended answer, Defendant's motion is futile as the record shows no basis for relieving Defendants of their waiver. *See* Fed.R.Civ.P. 15(a) (motions to amend pleadings may be denied based on, *inter alia,* futility). The fundamental rationale for requiring prompt interposition of an affirmative defense is to "place the opposing party on notice ... so as to prevent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2039499 (W.D.N.Y.)

(Cite as: 2008 WL 2039499 (W.D.N.Y.))

surprise or unfair prejudice." *Saks v. Franklin Covey Co., 316 F.3d 337, 350 (2d Cir.2003)* (citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 350 (1971)*). Notwithstanding a defendant's untimely assertion of any affirmative defense, the defense may be nevertheless entertained by the court "absent undue delay." *Saks,* 316 F.3d at 350 (citing cases). Here, the court finds Defendants' delay in asserting the defense by Defendants' Rule 12(b)(6) motion, given that Defendants were well-aware, based on Plaintiff's allegations of potential grounds for the defense, in attempting to assert it 10 months after service of the Amended Complaint, was "undue." *See Parker,* 204 F.3d at 339-40 (court properly exercises its discretion under Rule 16(b) in denying motion to amend scheduling order to permit filing of amended complaint asserting new claim for relief because of, *inter alia,* "undue delay").

**\*6** In sum, Defendants demonstrate no ground to conclude that good cause exists to justify Defendants' request to belatedly amend their answer to add the affirmative defense of Plaintiff's alleged failure to exhaust administrative remedies. Even if allowing Defendants to do so at this late stage well after the close of discovery cannot be shown to be of significant prejudice to Plaintiff, other than the obvious prejudice created by placing the issue back into the litigation and disruption of the court's case management orders, to grant Defendants the requested relief, will, in effect, constitute a 'second-bite-at-the-apple' for Defendants rewarding Defendants' failure to comply with prevailing Second Circuit law. *See Parker,* 204 F.3d at 340 (citing and quoting *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 610 (9th Cir.1992)). Additionally, such relief would be in contravention of Judge Skretny's determination that, as Defendants waived the defense, the "defense will not be considered by this court," Order at 3, a determination that is now the law of the case.

Defendants also moved to strike Plaintiff's response to Defendants' motion as untimely. (Doc. No. 47). Defendants argue that Plaintiff's response was filed on February 12, 2008, 11 days after the due date established by this court (Doc. No. 45). According to Plaintiff, his facility received the court's scheduling order on January 28, 2008, but did not arrange for Plaintiff's receipt until

January 30, 2008 which, taken together with Plaintiff's limited access to law library assistance, made it nearly impossible for Plaintiff to comply strictly with the court's schedule. Plaintiff's Reply/Response at 1 (Doc. No. 48). Specifically, Defendants maintain consideration of Plaintiff's opposition is prejudicial to Defendants in that Defendants were thus unable to file a reply by the February 8, 2008 due date established on the court's order.

First, it is well-established that in addressing prisoner *pro se* litigation, courts must be mindful of the inherent restrictions on prisoners as well as their *pro se* status. *See George v. McLeod,* 1988 WL 661495, \*1 (E.D.N.Y. Aug. 10, 1988) (refusing to hold incarcerated *pro se* plaintiff to strict 10-day time limit for filing response to motion); *Cook v. City of New York,* 578 F.Supp. 179, 184 (S.D.N.Y.1984) (unincarcerated pro se plaintiff with limited resources not held to strict compliance with procedural requirements). Second, in reviewing Plaintiff's response (Doc. No. 46), the court finds that nothing Plaintiff argued in opposition was so unanticipated by Defendants' arguments, presented in support of Defendants' motion, as to warrant reply. Specifically, rather than contend that good cause could not be established by Defendants because prior Second Circuit caselaw held exhaustion to be a waivable defense, Plaintiff sought to explain why § 1997e(a) should be inapplicable to Plaintiff's case. Doc. No. 46 (*passim* ). Because the controlling issue was not discussed by Plaintiff in his Response, no reason for any reply by Defendants was presented. If Defendants believed Plaintiff's late response required a reply they were free to request permission to do so, but they did not. Accordingly, Plaintiff's belated filing of his Response should not be stricken. *See Enron Oil Corp. v. Diakuhara,* 10 F.3 90, 97 (2d Cir.1993) (district court abused discretion by refusing to set aside default judgment against pro se defendant).

## CONCLUSION

**\*7** Based on the foregoing, Defendants' motion to amend the scheduling order (Doc. No. 44) is DENIED; Defendants' motion to strike Plaintiff's Response (Doc. No. 47) is DENIED.
SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2039499 (W.D.N.Y.)

(Cite as: 2008 WL 2039499 (W.D.N.Y.))


W.D.N.Y.,2008.

Mendez v. Barlow
Not Reported in F.Supp.2d, 2008 WL 2039499
(W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.